UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DONALD NICODEMUS,                )
                                 )
            Plaintiff,           )
                                 )
      v.                         )          No. 3:23-cv-744-DRL-MGG
                                 )
CITY OF SOUTH BEND, INDIANA,     )
                                 )
            Defendant.           )

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

**Introduction**

As of July 1, 2023, Indiana law, Ind. Code § 35-44.1-2-14, allows law enforcement

officers, in their unbridled discretion, to order a person to not approach within 25 feet of

the officers. Failure to abide by the order is a crime. The law contains no standards that

must be met before a law enforcement officer issues such an order. It does not require

that there be any cause for the officer to establish the 25-foot perimeter. Indeed, the law

allows law enforcement officers to block or impede citizen observation of police activity

even when the observation is not negatively impacting law enforcement functioning in

any way.

The law, although new, has already been applied by members of the South Bend

Police Department against plaintiff Donald Nicodemus, a citizen-journalist who

frequently records police activity in and around South Bend. He continues to engage in

1

his observation and recording of law enforcement and he is at significant risk of having the law again applied against him. This places him in the position of either being prevented from effectively observing police activity or being charged with a crime if he fails to abide by whatever perimeter law enforcement officers erect.

The law interferes with the well-established right of citizens to observe police activity and cannot be squared with the First Amendment. It is unconstitutional. As all the other requirements for the grant of a preliminary injunction are met, one should be issued, without bond.

### The Challenged Statute

Indiana Code § 35-44.1-2-14 provides, in its entirety:

> A person who knowingly or intentionally approaches within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching commits unlawful encroachment on an investigation, a Class C misdemeanor.

### Statement of Facts

Donald Nicodemus resides in South Bend. (Nicodemus Declaration ["Nic. Dec."] ¶ 1, Dkt. QQ-1). He is as a citizen-journalist and as such he has recorded police activity in South Bend and in other communities proximate to South Bend for a number of years. (*Id.* ¶¶ 2-3). His recordings have multiple purposes. (*Id.* ¶¶ 4-5). He wants citizens to see newsworthy events so that they understand what police are doing. (*Id.* ¶ 4). He also hopes and believes that to the extent that the recordings expose inappropriate or problematic

2

police behavior, his shining a light on the behavior will assist in ending the behavior. (*Id.*
¶ 5).

When Mr. Nicodemus observes and records the police, he is careful not to interfere
with them. (*Id.* ¶ 10). He generally records from public sidewalks, streets, and parks. (*Id.*).
Although he does not interfere with the law enforcement officers that he observes and
records, he will, at times, get closer than 25 feet from them so he is able to both see and
hear them, and so he is able to create video recordings that are discernible to those who
will see and listen to them. (*Id.* ¶ 11). Depending on the circumstances, if Mr. Nicodemus
is more than 25 feet away, it is often difficult, if not impossible, to hear and see and to
ensure that his recording devices capture what is happening. (*Id.*)

Mr. Nicodemus has a YouTube channel, "Freedom 2 Film," where he posts his
videos. (*Id.* ¶¶ 6, 8). Occasionally he will live stream video to the YouTube channel and
his recordings are archived there. (*Id.* ¶ 9). The channel currently has more than 23,000
subscribers. (*Id.* ¶ 6). On the landing page for his channel, above the text of the First
Amendment, is the statement: "This channel is about exercising my God Given rights as
an American . . . [f]ilming police activity and news worthy situations in South Bend
Indiana and surrounding areas." (*Id.* ¶ 7).

After midnight on July 20, 2023, Mr. Nicodemus learned that shots had been fired
near the intersection of North Brookfield Street and Lincoln Way West in South Bend. (*Id.*
¶¶ 12-13). In this area Lincoln Way West is a four-lane road, with two lanes in each

direction. (*Id.* ¶ 14).



Mr. Nicodemus went to the scene and noticed South Bend police officers and approximately six parked South Bend police vehicles present. (*Id.* ¶¶ 15, 16). There was no active shooting or any other unlawful activity taking place. (*Id.* ¶ 17). However, on the sidewalk at the southwest corner of the intersection there was a police officer apparently marking where bullet casings had been found. (*Id.*). That was obviously the location where the shots had been fired. (*Id.* ¶ 18).

Mr. Nicodemus went to the sidewalk on the northeast corner of the intersection,

diagonally across Lincoln Way West from the area where the shots had been fired. (*Id.* ¶ 19). Mr. Nicodemus was standing much farther than 25 feet from this area. (*Id.* ¶ 20). Other persons were also standing around watching what was going on. (*Id.* ¶ 21).

While standing there, Mr. Nicodemus began to live stream to "Freedom 2 Film." (*Id.* ¶ 22). He was not interfering with the police or the investigation in any way. (*Id.* ¶ 23). Nevertheless, approximately 9 minutes after Mr. Nicodemus began recording, Officer Stepp of the South Bend Police Department, who had been standing on or near the sidewalk on the southeast corner of Lincoln Way West and North Brookfield Street, crossed Lincoln Way West and ordered Mr. Nicodemus and the others to move back. (*Id.* ¶¶ 24, 25). This was shortly after a car had driven down the street. (*Id.* ¶ 24).

Officer Stepp walked off 25 feet from the west side of Brookfield Street going east towards where Mr. Nicodemus and the others were on the sidewalk. (*Id.* ¶ 25). He ordered Mr. Nicodemus to stay behind where the officer had determined that the 25-foot mark was. (*Id.*). Before being directed back by Officer Stepp, Mr. Nicodemus noted that there was a disturbance west of where he was. (*Id.* ¶ 26). This was in front of a house on the north side of Lincoln Way West that was much farther than 25 feet from where Mr. Nicodemus was. located (*Id.* ¶ 26). Because he was so far from the disturbance, he was unable to determine what was happening. (*Id.* ¶ 27).

Mr. Nicodemus moved back behind the mark established by Officer Stepp. (*Id.* ¶ 28). After about an additional 12 minutes, Officer Veal, another South Bend police officer,

approached Mr. Nicodemus and identified himself as the "crime scene tech" and stated that this was his crime scene and ordered Mr. Nicodemus and the others to move back another 25 feet, further east on the sidewalk. (*Id.* ¶ 29). There was no apparent reason for this as no one was interfering with the police and there was no activity, criminal or otherwise, going on. (*Id.* ¶ 30). The disturbance down the street had ended and cars were driving down Brookfield Street, even though that was within the area that Officer Veal had said was "his crime scene." (*Id.*).

Mr. Nicodemus protested that Officer Stepp had already marked out 25 feet. (*Id.* ¶ 31). Officer Stepp appeared to relent for a moment, but then renewed his order that Mr. Nicodemus and the others had to move back another 25 feet. (*Id.*). Officer Veal said that Mr. Nicodemus would go to jail if he did not move back another 25 feet, and he stated that there was a new law, a clear reference to Indiana Code § 35-44.1-2-14. (*Id.* ¶¶ 32-33). Officer Veal gave Mr. Nicodemus a tape measure and ordered him to walk back, which Mr. Nicodemus did, although the measure was only 10 feet. (*Id.* ¶¶ 34-35). Officer Veal ordered Mr. Nicodemus and others who were there to move back even farther, mentioning that the 25-foot requirement had gone into effect on July 1. (*Id.* ¶ 36).

Mr. Nicodemus intends to continue to film the South Bend police as a citizen-journalist. (*Id.* ¶ 37). He will continue to monitor and record police activity on the sidewalks, streets, and parks in South Bend. (*Id.*). He believes that he has a First Amendment right to monitor and record the police, and believes that this includes the

right to be closer than 25 feet, as long as he is not interfering with police activities. (*Id.* ¶ 38). But he is concerned that he will be arrested, and has already been threatened with arrest, for engaging in activity that he believes is protected by the First Amendment. (*Id.* ¶ 39).

**The Preliminary Injunction Standard**

A court must weigh several factors in the preliminary injunction determination:

(1) whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

(2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

(3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and

(4) whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g., Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987). The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984). Thus, "the more likely [the preliminary injunction movant] is to win, the less the balance of harms must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).

**Argument**

**I.     Mr. Nicodemus is likely to prevail on the merits of his First Amendment claim**

**A.     The activity in which Mr. Nicodemus wishes to engage constitutes expressive activity that implicates the First Amendment**

"Every Circuit Court of Appeals to address th[e] issue has held that there is a First Amendment right to record police activity in public." *Fields v. City of Philadelphia*, 862 F.3d 353, 355-56 (3d Cir. 2017) (collecting cases from five circuits) (internal parenthetical omitted). The Seventh Circuit reached this conclusion explicitly in *ACLU of Illinois v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), which invalidated an Illinois statute prohibiting persons from "mak[ing] audiovisual recordings of police officers performing their duties in public places and speaking at a volume audible to bystanders." *Id.* at 586. Explained the court:

> The right of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording. The right to publish or broadcast an audio or audiovisual recording would be insecure, or largely ineffective, if the antecedent act of *making* the recording is wholly unprotected . . . . By way of a simple analogy, banning photography or note-taking at a public event would raise serious First Amendment concerns; a law of that sort would obviously affect the right to publish the resulting photograph or disseminate a report derived from the notes. The same is true of a ban on audio and audiovisual recording.

*Id.* at 595-96 (emphasis in original). Were it otherwise, the government "could effectively control or suppress speech by the simple expedient of restricting an earlier step in the speech process rather than the end result." *Id.* at 597. Of course, the right to record police

8

activity means that there is a right to get close enough to the police to be able to meaningfully observe and record the activity. *See, e.g., Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102, 1105, 1107 (D. Ariz. 2022) (granting a preliminary injunction against an Arizona law making prohibiting video recording within eight feet of law enforcement activity if the person making the recording has been directed by law enforcement to stop recording).

That is enough to conclude that the activity in which Mr. Nicodemus has engaged and wishes to continue—producing and disseminating recordings of police activity conducted in public—is entitled to First Amendment protection. But it is also worth noting the vital role that the filming of law enforcement officers on the job has played in our Nation's recent history. "These recordings have both exposed police misconduct and exonerated officers from errant charges." *Fields*, 862 F.3d at 355. The Third Circuit in *Fields* provided as an example George Holliday's "recorded video of the Los Angeles Police Department officers beating Rodney King." *Id.* More recently, "the public became aware of the circumstances surrounding George Floyd's death because citizens standing on a sidewalk exercised their First Amendment rights and filmed a police officer kneeling on Floyd's neck until he died." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020).[1] In other words, not only does "the First Amendment protect[] the act of

---

[1]     Darnella Frazier, the young woman who took the video of George Floyd being murdered, reported that she was only a few feet away from him when he was killed. Joe Hernandez, NPR, *Read this Powerful Statement from Darnella Frazier, Who Filmed George Floyd's Murder*, May 26, 2021,

photographing, filming, or otherwise recording police officers conducting their official duties in public," *Fields*, 862 F.3d at 356, but citizens performing this act have advanced debate concerning racial justice and police reform in a manner that would likely have been impossible were they prohibiting from recording law enforcement either by an outright prohibition or by a distance limitation that prevented meaningful recording of law enforcement activity.

> **B.** **The statute is facially unconstitutional as it vests unbridled discretion in law enforcement to determine if activity protected by the First Amendment may take place**
>
> > **1.** **Any statute impinging on First Amendment activity may not vest unbridled discretion in government officials to determine whether the activity will be allowed**

Once a plaintiff demonstrates that the activity in which he wishes to engage is constitutionally protected, the next step in the First Amendment analysis is to determine the nature of the "forum" in which he wishes to exercise this activity. *See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-47 (1983) (describing forum analysis). This need not take long as Mr. Nicodemus wishes to film police activity on sidewalks, streets, and parks—"quintessential public forums" which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions,"

---

at https://www.npr.org/2021/05/26/1000475344/read-this-powerful-statement-from-darnella-frazier-who-filmed-george-floyds-murd (last visited Aug. 16, 2023).

and where First Amendment rights are therefore at their zenith. *Id.* at 45 (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)).

In a public forum, regulations that impinge upon First Amendment activities are unconstitutional unless they are content neutral, narrowly tailored to serve a significant government interest, and leave open ample alternatives channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citations omitted). As the Seventh Circuit has noted in the context of a challenge to a permit policy, "[t]o qualify as 'content-neutral,' a permit policy cannot invest 'unbridled discretion' in the person who decides whether a permit will issue because excessive discretion can lead to discriminatory enforcement." *Smith v. Executive Dir. of Ind. War Memorials Com'n*, 742 F. 3d 282, 289 (7th Cir. 2014) (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002); *Forsyth Co. v. Nationalist Movement*, 505 U.S. 123, 130-33 (1992), and; *Southworth v. Bd. of Regents of the Univ. of Wis. Syst.*, 307 F.3d 566, 578-79 (7th Cir. 2002)). "[A]n indeterminate prohibition carries with it 'the opportunity for abuse, especially where it has received a virtually open-ended interpretation.'" *Minnesota Voters Alliance v. Mansky*, __ U.S. __, 138 S. Ct. 1876, 1891 (2018) (quoting *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987)) (internal alterations omitted).

Accordingly, the Supreme Court has long recognized "that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of*

*Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 756 (1988) (citing numerous cases); *see also, e.g., Church of Am. Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 681 (7th Cir. 2003) (describing "the Supreme Court's hostility to regulations of speech that allow broad discretion ['unbridled discretion' is the favored formula] to the regulators," and citing cases); *cf. Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (reiterating "the more covert forms of discrimination that may result when arbitrary discretion is vested in some governmental authority").

To be constitutional, governmental "discretion must be guided by objective, workable standards," *Minnesota Voters Alliance*, 138 S. Ct. at 1891, or, in other words, by "neutral criteria," *City of Lakewood*, 486 U.S. at 760. These standards "provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech" and without them "*post hoc* rationalizations by the licensing official and the use of shifting or illegitimate criteria are far too easy, making it difficult for courts to determine in any particular case whether the licensor is permitting favorable, and suppressing unfavorable, expression." *Id.* at 758. A regulatory scheme that vests this unbridled discretion in government officials is facially unconstitutional. *Id.* at 759-61.[2]

---

[2]     Although not relevant here, the Seventh Circuit has made it clear that "unbridled discretion" violates the viewpoint neutrality that the government must abide by in forums other than traditional public forums, *see, e.g., Perry Educ. Ass'n*, 460 U.S. at 45, as "the requirement of viewpoint neutrality includes as a corollary a prohibition on unbridled discretion." *Southworth.*, 307 F.3d at 579-80.

### 2.     The challenged statute vests unbridled discretion in law enforcement officers and is therefore unconstitutional

The question, therefore, is whether Indiana Code § 35-44.1-2-14 contains "objective, workable standards" to guide an officer's determination of whether an individual may remain within twenty-five feet of the officer.

Quite plainly, it does not: there are no standards whatsoever describing the circumstances in which an officer may "order[]" a person "to stop approaching," and thereby subject that person to arrest and prosecution if he does not do so. No more is necessary to invalidate the statute. After all, it certainly cannot be presumed that law enforcement "will act in good faith and adhere to standards absent from the [statute]'s face [as] this is the very presumption that the doctrine forbidding unbridled discretion disallows." *City of Lakewood*, 486 U.S. at 770. But even were this not so, Mr. Nicodemus's experience with the statute underscores the impermissible discretion afforded to law enforcement. When he attempted to film police activity on July 20th, he was across the street (and more than twenty-five feet away) from the area of police activity. Nonetheless, he was required to move twenty-five feet away from the scene and then an additional twenty-five feet—presumably because law enforcement officers establishing a perimeter are "lawfully engaged" in their duties within the meaning of Indiana Code § 35-44.1-2-14.

Under the challenged statute officers can simply choose whether or not to allow a person to remain close enough to film their activities. This unrestrained discretion is

prohibited by the First Amendment, and Mr. Nicodemus is likely to prevail on his constitutional claim.

### C.   Even if the statute is deemed to be content neutral, which it is not as it allows for unbridled discretion, the statute is unconstitutional

Given that the statute vests unbridled discretion in law enforcement officers, there is no need to proceed further as the statute is clearly unconstitutional as it fails the requirement of content neutrality. However, even if this is ignored, the statute violates the other requirements necessary for a regulation of expressive conduct in a public forum to be constitutional as it is neither narrowly tailored to serve a significant government interest, nor does it leave open other ample alternative channels for communication. *Ward*, 491 U.S. at 791.

### 1.   The challenge statute is not narrowly tailored to serve a significant government interest

The narrow tailoring requirement imposes a burden on the government "of showing that the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 665 (1994) (quoting *Ward*, 491 U.S. at 799). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citation omitted).

The statute here violates the "narrowly tailoring" requirement. The only "evil" that the statute can be designed to prohibit is conduct that interferes with police activities.

14

But Indiana already has a statute, Indiana Code § 35-44.1-4, *et seq.*, that allows perimeters to be established around areas that are deemed to be "emergency incidents." Presumably, in order for this law to apply, there must be an "emergency incident."[3] While this latter statute could certainly be applied in an unconstitutional manner, its focus on there being an actual emergency contrasts with the statute here. Not only does Indiana Code § 35-44.1-2-1 not require an emergency in order for it to applied, but it requires nothing at all other than an officer deciding to invoke it, even though First Amendment activities are impinged upon. This is the opposite of narrow tailoring.

> 2.    **The statute fails to leave open ample alternative channels of communication**

In assessing whether ample alternative channels of communication have been left open by a challenged statute or other government action impacting First Amendment rights, the Seventh Circuit has stressed that "an alternative must be more than merely theoretically available. It must be realistic as well . . . [and it] cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Gresham v. Peterson*, 225 F.3d 899, 906-07 (7th Cir. 2000) (internal citation omitted). Mr. Nicodemus is unable to reach any audience if he is barred from being able

---

[3]    It is clear that this is not the statute that was invoked against Mr. Nicodemus by the police as there was no "emergency incident." Indeed, vehicles were allowed to pass between Mr. Nicodemus and the site of the policy activity. Moreover, the "emergency incident" statute, which is not a new statute, is obviously not the new law to which Officer Veal referred. (Nic. Dec. ¶¶ 33, 36).

see, perceive, and record what is happening. There are therefore no alternative channels of communication. The ample alternative requirement cannot be satisfied where there are no alternatives. *See, e.g., Bery v. City of New York*, 97 F.3d 689, 698 (2d Cir. 1996) (an ordinance preventing visual artists from selling their art in public areas in New York City did not leave open ample alternatives as no other public forum existed for the artists).

"When regulating First Amendment activity in a public forum the government has a difficult burden to carry." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1035 (7th Cir. 2002). Neither South Bend nor the State of Indiana can carry that burden.

**II**.      **The remaining factors for the issuance of a preliminary injunction are met**

   **A.      Mr. Nicodemus faces irreparable harm for which there is no adequate remedy at law**

Mr. Nicodemus is likely to demonstrate that the challenged statute violates the First Amendment. He has been presented with a choice, either to change his behavior and lose his First Amendment rights or potentially face criminal penalties if he continues as he has in the past. "That Hobson's choice impinges on Plaintiff's First Amendment freedoms and therefore constitutes irreparable harm." *Kimberly-Clark Corp. v. Dist. of Col.*, 286 F. Supp. 3d 128, 147 (D.D.C. 2017). After all, "the loss of First Amendment freedoms, even for minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Seventh Circuit has stressed that the "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th

16

Cir. 2006). Mr. Nicodemus's activities are aimed at informing and educating the public, and no amount of money can stand in for that gathering and dissemination of information. Money damages are not sufficient to rectify the irreparable injury that Mr. Nicodemus faces.

### B.     The balance of harms favors Mr. Nicodemus

A governmental entity cannot claim that requiring it to comply with the First Amendment is harmful or burdensome. *See id.* at 867 (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all"). The same is true here. An injunction will simply maintain the state of affairs that existed prior to the passage of the statute, and will allow Mr. Nicodemus to continue to engage in his constitutionally protected activities that inform and educate the public.

### C.     The public interest will not be disserved by the grant of a preliminary injunction

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 859. As previously emphasized, the public interest is served by allowing individuals to film the activities of law enforcement officers, as such recordings have "both exposed police misconduct and exonerated officers from errant charges." *Fields*, 862 F.3d at 355.

### III.    The preliminary injunction should issue without bond

While Federal Rule of Civil Procedure 65, by its terms, requires that a preliminary

injunction be accompanied by "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," Fed. R. Civ. P. 65(c), no bond should be required in the absence of the possibility of any monetary injuries. *See, e.g., Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (noting cases that "allow a district court to waive the requirement of an injunction bond [where] the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction."). A preliminary injunction here will simply allow Mr. Nicodemus to film the public activities of law enforcement. There is no risk of monetary damages to anyone if the injunction is granted.

## Conclusion

For the foregoing reasons, the Court should grant the requested preliminary injunction and enjoin the enforcement of Indiana Code § 35-44.1-2-14.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 4602
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiff