**United States District Court**
**Northern District of Indiana**
**South Bend Division**

| | |
|---|---|
| **Donald Nicodemus**; | |
| *Plaintiff,* | |
| *v.* | **Civil Case No.** 3:23-cv-744 DRL-MGG |
| **City of South Bend, Indiana**; | |
| *Defendant,* | |
| *and* | |
| **State of Indiana**, | |
| *Intervenor.* | |

## Joint Response in Opposition to Plaintiff's Motion for Preliminary Injunction

Plaintiff Donald Nicodemus, on August 9, 2023, moved for a preliminary injunction to prevent enforcement of Indiana Code § 35-44.1-2-14. ECF 7 ("**PI Motion**"). Defendant City of South Bend and Intervenor-Defendant State of Indiana now timely respond. *See* ECF 24.

## Introduction

Plaintiff Donald Nicodemus ("**Mr. Nicodemus**"), a "citizen-journalist," Mem. Supp. Mot. PI ("**PI Memorandum**"), ECF 20, brings an odd request. He desires restraint of the right of law enforcement officers ("**Officers**") to, at their discretion, direct citizens away when necessary, a well-recognized right. Yet, finding a law that amply limits Officer discretion by decreeing that citizens may be directed only 25 feet away, *and* are only subject to penalties *if* they knowingly disobey, he challenges it. As shown below, not only does Indiana Code § 35-44.1-2-14 ("**Buffer Law**") limit discretion in this way, it is also properly tailored to numerous compelling interests.

## Facts

On July 20, 2023, at about 12:25AM, gunshots were heard in the area of Lincoln Way West

and Brookfield Street in South Bend, Indiana.[1] Affidavit of Officer Jeffrey Veal ("**Veal Aff.**"),

¶4. South Bend Officers, including Jeffrey Veal and Nathan Stepp, responded. *Id.*; Affidavit of

Officer Nathan Stepp ("**Stepp Aff.**"), ¶4.

Officer Veal was the crime scene technician in charge of this scene. Veal Aff., ¶3, ¶6.

Typically, in this capacity, the first thing he does is determine where evidence may be found and

what constitutes the crime scene. *Id.* at ¶6. He considered the crime scene to include the entire

intersection of Lincoln Way West and Brookfield Street. *Id.* at ¶7. Although he did not discuss

this with the other Officers on-scene, the intersection was soon blocked off from traffic. *Id.*

When Officer Stepp arrived at the scene, he parked his patrol car so it was blocking

westbound traffic from entering the intersection, and began to perform scene security. Stepp Aff.,

¶8, ¶10; Stepp Video, timestamp 00:33:50 *et seq.* Officer Stepp observed several people at the

northeast corner of the intersection. Stepp Aff., ¶11. He was keeping an eye on them so that, if

any of them started to walk into the crime scene, he could stop them. Stepp Aff., ¶11.

At approximately 12:53AM, Mr. Nicodemus was at the northeast corner of Lincoln Way

West and Brookfield Street, live-streaming the investigation of shots fired. ECF 1, ¶¶23-24;

Stepp Video at 00:53:50 *et seq.* Officer Stepp was standing at the southeast corner of the

intersection. ECF 20-1, ¶24. About that time, there was a disturbance between occupants of 1905

Lincoln Way West and 1909 Lincoln Way West. Veal Aff., ¶10. Several of those individuals

began shouting at and threatening one another. *Id.*; ECF 1, ¶27. This disturbance occurred as

Officers were investigating the shots fired. Veal Aff., ¶10.

Shortly after the shouting began Mr. Nicodemus and another, also appearing to be recording

---

[1]In his Complaint and in his Declaration, Mr. Nicodemus states that Lincoln Way West is a four-lane road, with
two lanes in each direction. *See* ECF 1, 20; ECF 20-1, 14. This is incorrect. Lincoln Way West at Brookfield Street
is a two-lane road with a center turn lane. *See* Officer Stepp Body Camera Video ("**Stepp Video**"), Ex. 1, *passim.*

on a cell phone, began to walk across Brookfield Street toward the disturbance. Stepp Video, timestamp 00:54:00; Stepp Aff., ¶15.[2] Officer Stepp ordered them to stay back. *Id.* at ¶16; Video by Donald Nicodemus ("**Nicodemus Video**"), Ex. 2, at 9:25; Stepp Video, timestamp 00:54:05.

Mr. Nicodemus omits from his Complaint and Declaration the fact that he and his companion were walking across Brookfield and toward the scene of the disturbance when Officer Stepp ordered them to stay back. *See* ECF 1, ¶¶23-27; ECF 20-1, ¶¶19-26. Instead, he suggests he was standing passively on the sidewalk at the northeast corner of the intersection when Officer Stepp ordered him back. *See* ECF 1, ¶26; ECF 20-1, ¶25. This is false. As shown in Officer Stepp's body camera video, Mr. Nicodemus and his companion were not standing passively on the sidewalk when Officer Stepp ordered them to stay back. Stepp Video, timestamp 00:54:00.

Officer Stepp ordered Mr. Nicodemus and his companion to stay back because he did not want them to approach Officers from behind while those Officers were addressing a potentially violent situation. Stepp Aff., ¶16. Officer Stepp was also concerned for the safety of Mr. Nicodemus and his companion. Stepp Aff., ¶16. He was aware there had been gunfire at that location, but did not know whether the firearms had been located, whether anyone who had been involved in the gunfire was still around, or whether anyone at the scene of the disturbance was armed. Stepp Aff., ¶16. Officer Stepp's decision to order Mr. Nicodemus and his companion to stay back had nothing to do with the fact that they were recording. Stepp Aff., ¶16.

When Officer Stepp approached them and ordered them to stay back, Mr. Nicodemus and his companion responded, "Get out your tape measure or put up tape," or words to that effect. Nicodemus Video at 9:30; Stepp Video, timestamp 00:54:05. Mr. Nicodemus and his companion yelled at, berated, swore at, and threatened to sue Officer Stepp. Nicodemus Video at 9:40 *et seq.*

---

[2]For ease of reference, this other person will be referenced herein as Mr. Nicodemus' "companion." However, it appears that Mr. Nicodemus and this other person just happened to be present and recording at the same time.

Officer Stepp walked off what he estimated to be 25 feet from the northwest corner of the intersection and ordered them not to pass that spot. Stepp Video, timestamp 00:54:25 *et seq.* This effectively required Mr. Nicodemus and his companion to return to the sidewalk they had been standing at before they started to cross Brookfield Street. *See* Stepp Video, timestamp 00:54:50.

After Officer Stepp ordered Mr. Nicodemus and his companion to stay back, Mr. Nicodemus and/or his companion continually yelled at, swore at, and threatened to sue Officer Stepp and the other Officers. Nicodemus Video at 9:35 *et seq.*; Stepp Video, timestamp 00:54:00 *et seq.*

Officer Stepp walked to the area of the disturbance, in case the situation turned violent and he was needed to assist restoring order. Stepp Aff., ¶20; *see also* Stepp Video, timestamp 00:55:05. As he was walking to that area, Mr. Nicodemus and his companion yelled at him, calling him a "piece of shit" and "fucking piece of shit." Nicodemus Video at 10:25. They proceeded to hurl additional abuse at him, calling him "fucking punk ass" and "bitch." Nicodemus Video at 11:50.

Meanwhile, Officer Veal and other Officers were working to calm the situation at 1905 and 1909 Lincoln Way West and prevent violence. Veal Aff., ¶10.

The Officers were eventually able to calm the disturbance at the residences. Veal Aff., ¶10. But tensions remained high after the shouting stopped. Veal Aff., ¶10.

Officer Veal heard yelling at the northeast corner of the intersection. Veal Aff., ¶11. Based on its volume and tone, he could tell there was a problem. Veal Aff., ¶11. Walking to intersection's northeast corner, he heard people yelling verbal abuse toward the Officers. *See* Nicodemus Video at 12:15 *et seq.* He ordered everyone back 25 feet. Stepp Video, timestamp 00:57:05. Mr. Nicodemus and the others at the intersection did not comply. Nicodemus Video at 12:25.

Officer Veal wanted everyone on the northeast corner of the intersection to move back because their yelling and verbal abuse was interfering with the Officers' ability to investigate the

**Joint Resp. in Opp. to PI Mot.**          4

shooting incident. Veal Aff., ¶13. As a crime scene technician investigating a scene, Officer Veal is often not in a position to respond quickly during an emergency, and he relies on the Officers providing scene security to ensure his safety. Veal Aff., ¶13. Officer Veal was concerned that Mr. Nicodemus and his companion were distracting Officers from their scene security duties. Veal Aff., ¶13. Officer Veal was aware of a past incident where crime scene technicians were nearly struck by gunfire while an Officer providing scene security was distracted by bystanders. Veal Aff., ¶13. Officer Veal's decision to order everyone on the corner to move back had nothing to do with the fact that two of them were recording. Veal Aff., ¶13.

When Officer Veal again ordered everyone to move back, Mr. Nicodemus' companion responded, "Fuck you," and Mr. Nicodemus and his companion continued to argue with Officer Veal. Stepp Video, timestamp 00:57:05 *et seq.* Officer Veal again ordered everyone to move back 25 feet, referred to the "new law," and warned everyone that they would be arrested if they did not comply. Stepp Video, timestamp 00:57:05 *et seq.* The "new law" that Officer Veal was referring to was IC 35-44.1-2-14. *See* Veal Aff., ¶14. Officer Veal ordered everyone to move back several times; they repeatedly refused to comply with these orders. Nicodemus Video at 12:30 *et seq.* Mr. Nicodemus demanded that Officer Veal show him 25 feet. *Id.*

Mr. Nicodemus' companion was particularly abusive, addressing Officer Stepp as "your fucking punk ass" and "lying motherfucker," making statements suggesting he knew where he lived, and threatening to come to his house. Stepp Video, timestamp 00:57:05 through 00:58:40.

Rather than arrest Mr. Nicodemus and the others for refusing to comply with his repeated orders to move back, Officer Veal agreed to get his tape measure. Nicodemus Video at 12:55. The tape measure readily available to him was 10 feet. ECF 20-1, ¶35; Veal Aff., ¶15. He returned to the northeast corner of the intersection and asked Mr. Nicodemus to take the end of

the tape measure and move back 10 feet. Nicodemus Video at 14:10. Mr. Nicodemus complied, but, when Officer Veal asked him to help him measure another 10 feet, responded, "Fuck you, man." *Id.* at 14:15 *et seq.* Officer Veal then pointed out a spot that appeared to be 25 feet away from the intersection, and ordered Mr. Nicodemus and the others to move back to that spot. *Id.* at 14:30. Mr. Nicodemus and the others eventually complied. *Id.* at 14:35.

Officer Veal ordered everyone at the northeast corner of the intersection to move back 25 feet, not just the people who were recording. Nicodemus Video at 14:35.

Mr. Nicodemus and his companion continued to hurl verbal abuse at the Officers, yelling at them, swearing at them, and threatening to sue them. Nicodemus Video at 14:45 through end.

South Bend police officers have increasingly experienced interference in their duties by people showing up at crime scenes and recording on cellphones or similar devices. Affidavit of Chief Timothy Lancaster ("**Lancaster Aff.**"), ¶¶4-5, ¶¶8-11. Some people will brazenly walk into active crime scenes unless crime scene tape has been set up. Lancaster Aff., ¶5.

Members of the public encroaching on police investigations present a number of safety and security concerns. Lancaster Aff., ¶6. Officers cannot know the intentions of the people encroaching on the investigation. Lancaster Aff., ¶6. They could be present for the purposes of victim or witness intimidation, destruction of evidence, or the commission of other crimes. Lancaster Aff., ¶6. Violence can erupt at any moment, especially at scenes where tensions are high. Lancaster Aff., ¶6. If violence does erupt, bystanders are more likely to be injured if they are encroaching on the scene. Lancaster Aff., ¶6. If bystanders are encroaching on a scene, Officers must divide their attention between the bystanders and their scene security duties, which increases the risk to Officer safety. Lancaster Aff., ¶6. Bystanders encroaching on a crime scene may inadvertently contaminate or destroy evidence. Lancaster Aff., ¶6.

People recording South Bend police officers often come close enough to overhear Officers' conversations with victims and witnesses. If close enough to record Officers taking statements from victims and witnesses, the recording will very likely capture the victims' and witnesses' sensitive personal information, such as social security number and date of birth. Stepp Aff., ¶23. Some people have recorded the computer screens inside Officers' vehicles, which often display sensitive personal information about victims, witnesses, suspects, and others. Veal Aff., ¶18.

South Bend police officers often encounter situations where people are reluctant to give a statement because they fear retaliation. Lancaster Aff., ¶7. South Bend police officers have experienced situations where witnesses have been reluctant to give statements because people were nearby recording. Stepp Aff., ¶24. If a victim or witness refuses to give a statement because they feel intimidated by someone recording what they are saying to the police, that could lead to a violent criminal remaining on the streets instead of being arrested and prosecuted. Lancaster Aff., ¶7. If a victim or witness is recorded giving a statement to the police, the victim or witness could be subjected to reprisals for talking to the police. Stepp Aff., ¶21.

Mr. Nicodemus gets closer than 25 feet when he is recording, so that he is able to "create video recordings that are discernable to those who will see and listen to them." ECF 20-1, ¶11.

Other St. Joseph County law enforcement agencies have also experienced similar problems with people getting too close to ongoing police activities in order to record. Lancaster Aff., ¶12.

## Preliminary Injunction Standard

To obtain a preliminary injunction, one must show irreparable harm absent same, inadequacy of legal remedies, and likely success on the merits. *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016). If so, the court weighs the irreparable harm the movant would suffer absent the injunction against any such harm to the non-movant if granted, and any effects such

grant or denial would have on the public. *Baskin v. Bogan*, 983 F. Supp. 2d 1021, 1024–25 (S.D. Ind. 2014) (citation omitted). A high likelihood of success on the merits results in a lower need for the balance of harms to favor the plaintiff, and vice-versa. *Jones*, 842 F.3d at 1059–60.

## Facial Challenge Standard

A facial, First Amendment challenge to a law will stand only if the law has no constitutional application, lacks a "plainly legitimate sweep," or if "a substantial number of its applications are unconstitutional" relative to its "plainly legitimate sweep." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450, 450 n.6 (2008) (cleaned up; citations omitted). In determining facial invalidity, courts "must be careful not to go beyond the statute's facial requirements and" engage in hypothetical speculation—"facial challenges are disfavored for several reasons," particularly the frequent need for such speculation. *Id.* at 449–50.

## Argument

The 7th Circuit has recently reaffirmed the right of Officers to direct citizens away. In response to the claim of a reporter, Lund, that Officers unconstitutionally suppressed his speech, *Lund v. City of Rockford, Illinois*, 956 F.3d 938, 943 (7th Cir. 2020), the court said the Officers'

> reasonable belief that Lund[] . . . might . . . obstruct[] their investigation was sufficient for them to . . . ask him to move along. . . . And generally applicable laws, like those that prohibit interference with a police investigation, do not offend the First Amendment simply because their enforcement . . . has incidental effects on [the press] . . . . The officers had a clear right to . . . direct him to cease doing anything that [jeopardized] their [] investigation.

*Id.* at 947 (cleaned up; citation omitted). The court also found lacking the argument that Officers' discretion in enforcing the law allowed them to use it to suppress speech. *Id.* at 944–45.

Mr. Nicodemus' arguments rely mainly on the theories that (**1**) there is a near-limitless right to record Officers and (**2**) discretion in the exercise of lawful authority likely renders unconstitutional any law that could remotely touch on First Amendment concerns. *Lund* and ample

additional cases foreclose both arguments. The PI Motion should therefore be denied.

### I. The press has no access where the general public does not.

Press freedom is robust, but not limitless. Like free speech, it is properly constrained where it conflicts with overarching needs protecting the rights of *all* people, such as public safety. So it is not "absolute." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581 n.18 (1980). "[T]he right to film" may constitutionally be limited, *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011), and the press has "no . . . right of access . . . when the general public is excluded[,]" *Branzburg v. Hayes*, 408 U.S. 665, 684–85 (1972). In short, press freedom "does not invalidate every incidental [press] burdening" resulting from generally applicable laws. *Id.* at 682–83 (collecting cases). The only question in a First Amendment challenge to a law enforcement ("**LE**") buffer zone law is whether the *manner* in which it affects the right to film, if at all, is permissible.

Accordingly, it is "frivolous to assert" that the Constitution "confers a license on . . . the reporter . . . to violate valid criminal laws." *Id.* at 691. Thus, absent any other infirmity rendering the Buffer Law invalid, it must stand. Mr. Nicodemus fails to show such an infirmity.

### II. Laws touching on speech have been upheld from lowest to strictest scrutiny.

**A. First Amendment claims cannot stand against neutral, generally applicable laws.**

Neutral, generally applicable laws with a rational basis are constitutional. *Illinois Bible Colleges Ass'n v. Anderson*, 870 F.3d 631, 639 (7th Cir. 2017), as amended (Oct. 5, 2017).

**1. Incidental First Amendment burdens do not render a law non-general.**

A law is generally applicable if it does not prohibit First Amendment conduct "while permitting [non-First Amendment] conduct that" similarly harms the state's interests. *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1877 (2021). General laws do not lose their generality simply because their enforcement may incidentally burden such conduct. For example,

**Joint Resp. in Opp. to PI Mot.**                    9

despite finding a right to "*mak[e]* . . . [a] recording," *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012), the 7th Circuit explicitly distinguished the law before it from laws "not aimed at . . . press rights as such." *Id.* at 601 (citing *Branzburg*); *see also id.* at 608 ("privacy interests . . . may justify banning audio recording[.]"). "[G]enerally applicable laws do not offend the First Amendment simply because their enforcement . . . has incidental effects on [the] ability to gather . . . news." *Id.* (quoting *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991)).

The court has since reaffirmed these principles. *Spiegel v. McClintic*, for example, quoted *Alvarez*, stating, "'When "speech" and "nonspeech" elements are combined, and the "nonspeech" element . . . triggers the legal sanction, the incidental effect on speech rights will not normally raise First Amendment concerns.' Certainly, a person can . . . videotape in a sufficiently disruptive way that it would be not unconstitutional to arrest the individual . . . ." 916 F.3d 611, 618 (7th Cir. 2019) (quoting 679 F.3d at 602). And *Lund*, with its instruction that Officers may properly require the press to "move along" and "cease" impeding their lawful duties, *Lund*, 956 F.3d at 947, made this even clearer. So *Alvarez* did not, as Mr. Nicodemus intimates, establish a near-limitless right to record police, *see* PI Mem. 8–10. Instead, the 7th Circuit has consistently followed *Cohen*: incidental First Amendment effects do not render a law non-general.

**2. Minimal discretion does not render a law unrelated to press activity non-neutral.**

A law is neutral if it can "be justified without reference to the content of the regulated speech[.]" *Price v. City of Chicago*, 915 F.3d 1107, 1117 (7th Cir. 2019) (quoted source omitted). To be non-neutral due to unfettered discretion, the law itself must have "a 'close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of . . . censorship . . . .'" *Weinberg v. City of Chicago*, 310 F.3d 1029, 1044 (7th Cir. 2002) (quoting *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 759 (1988)).

### a. Laws not aimed at press-related conduct have no nexus.

Laws "that are not aimed at conduct commonly associated with expression and do not permit . . . determinations to be made on the basis of ongoing expression or the words about to be spoken"—or *do* provide room for such determinations only "on rare occasions"—carry "little danger of censorship," and thus do not have a *nexus* carrying a censorship risk. *Lakewood*, 486 U.S. at 760–61 (it is constitutionally permissible if "on rare occasion an opportunity for censorship will exist, such as when an unpopular newspaper seeks . . . building permits.").

So no "nexus" exists in laws that are "too blunt a censorship instrument to warrant" review absent "actual misuse," such as the hypothetical building permit law, *id.*, or even illuminated sign (quintessential speech media) permitting laws not distinguishing between types of speech. *Gen. Auto Serv. Station v. City of Chicago*, No. 00 C 368, 2006 WL 1460017, at *5 (N.D. Ill. May 23, 2006), *aff'd*, 526 F.3d 991 (7th Cir. 2008); *see also Gen. Auto*, 526 F.3d at 999 (no censorship danger if "alternative outlet" available). Similarly, laws "designed to prevent crime . . . [and] protect . . . urban life" serve valid interests "*unrelated to the suppression of free expression.*" *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (emphasis added).

Notably, as Mr. Nicodemus' own brief hints, the unbridled discretion analysis usually occurs in permit cases. *See* PI Mem. 11. This is because permit denial wholly prevents the intended conduct, leaving no alternative avenues. A law that has virtually no relation to First Amendment conduct, on the other hand, *cannot* be used to wholly prevent it (for example, press activity could hardly be prevented by a statute that, at worst, would require someone wishing to videotape Officer activity to provide space to safely *conduct* that activity). *See Ward v. Rock Against Racism*, 491 U.S. 781, 793–94 (1989).[3] This exemplifies the reasoning for the nexus

---

[3] *Ward* observed that unbridled discretion challenges "generally involve[]" discretion to wholly "deny expressive activity," so it was "far from clear" that challenge should be permitted against regulations affording discretion only

requirement: if a statute has little connection to or effect on First Amendment activities in the first place, it *cannot* be enforced in a way that restricts such activities in a discriminatory way.

### b. "Unbridled discretion" analysis inapposite where right is hardly affected.

The question in unfettered discretion cases is, of course, how does the discretion affect a *right*? For example, in *Wisconsin Interscholastic Athletic Ass'n v. Gannett Co.*, 658 F.3d 614 (7th Cir. 2011), although recognizing the "right to 'report on' . . . an event," *id.* at 624, the court nonetheless found no "right to broadcast an entire event," *id.* at 625. Noting this, the court found comparison to "unbridled discretion" cases inapposite in a challenge relating to discretion to prevent broadcasting an *entire event*, which had little relation to the right to simply *report* on the event. Similarly, a statute that allows discretion to prevent recording Officers in their *immediate vicinity* has little effect on the right to simply *record* the Officers.

### c. "Unbridled discretion" analysis looks to policy and interpretation.

Finally, in analyzing for unbridled discretion, courts look beyond the law itself. "Administrative interpretation and implementation" are "highly relevant" in facial challenges to state law, as federal courts "must consider any limiting construction" an "enforcement agency" has. *Ward*, 491 U.S. 781 at 795–96 (citations omitted). The *Ward* Court found that discretion was properly limited by the city's "interpret[ation]," "policy," "practice," and "goal" with respect to the challenged regulation. *Id.* at 795; *see also Wisconsin Intersch. Athletic Ass'n v. Gannett Co.*, 716 F. Supp. 2d 773, 799 (W.D. Wis. 2010), *aff'd on other grounds*, 658 F.3d 614 (7th Cir. 2011) (looking to "entire policy," not just one line explicitly granting state actors "sole discretion"; finding that "entire policy" showed discretion was very limited (citation omitted)).

Regarding *implementation*, it was recently reaffirmed that in the policing context, as opposed

---

to "provide inadequate sound" equipment, rather than to deny permits "altogether," since there was no allegation of discretion to deny speech entirely. Such challenge, then, was "of an entirely . . . lesser[] order of magnitude." *Id.*

to licensing, a plaintiff alleging improper discretion must show "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech" were not. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1727 (2019); *Lund*, 956 F.3d at 945.

**B. Rational basis review.**

Because neutral, generally applicable laws, including those touching on both "speech" and "nonspeech" elements, do not implicate the First Amendment when the "nonspeech" element is what "triggers the legal sanction," *Alvarez*, 679 F.3d at 602; *Spiegel*, 916 F.3d at 618, First Amendment challenges to such laws "require[] only rational basis review . . . , 'the residual level of scrutiny that courts apply to all laws not . . . infringing a fundamental right.'" *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 949 (7th Cir. 2015) (quoted source omitted).

Under such review, a law rationally related to a legitimate interest "is presumed constitutional" and "avoids constitutional scrutiny." *Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653 (7th Cir. 2013) (citation omitted). This deferential standard places a "weighty burden" on the law's challenger, who must "'negative every . . . basis which might support' the law because [courts] will uphold it 'if there is any reasonably conceivable state of facts' supporting the [burden imposed]. This basis need not be in the record[.]" *Id.* (citations omitted).

**C. Time, place, and manner regulations.**

Neutral laws that *do* regulate speech trigger intermediate scrutiny if they regulate only "the time, place, or manner" thereof ("**TPM Restrictions**") and are narrowly tailored to legitimate interests. *Ward*, 491 U.S. at 791. They "need not be the least restrictive" means, but instead, need only "promote[] a substantial government interest that would be achieved less effectively" in their absence. *Id.* at 798–99 (cleaned up; citation omitted); *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cnty. of Marion, Indiana*, 889 F.3d 432, 438 (7th Cir. 2018).

The public may be excluded by TPM Restrictions serving the "interest in enforcing . . . laws," which Officers "[a]re entitled to enforce [ ] free from possible interference . . . even [from] those claiming a[n] . . . interest in the transaction." *Colten v. Kentucky*, 407 U.S. 104, 109 (1972).

**D. Strict scrutiny**.

Finally, content-based laws are subject to strict scrutiny. *HH-Indianapolis*, 889 F.3d at 438. The Buffer Law is neutral, *infra* Part III.A.2, but *even* necessary non-neutral restrictions on expression, including 100-foot zones restricting political speech, are upheld when narrowly drawn to a compelling interest. *Burson v. Freeman*, 504 U.S. 191, 198 (1992). This includes content-based "prior restraints," *contra* PI Mem. 11–12 (alleging same are simply "unconstitutional"). *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749 (7th Cir. 1999); *Burson*, 504 U.S. at 211; *see also, e.g.*, *Denton v. City of El Paso*, 861 F. App'x 836, 840 (5th Cir. 2021) (prior restraints stand if necessary for a compelling interest and "least restrictive means . . . .").

### III. The Buffer Law easily withstands scrutiny.

These principles compel the conclusion that the Buffer Law is constitutional. The state has a "legitimate interest in enforcing its . . . laws," which Officers "[a]re entitled to enforce [] free from possible interference," *Colten*, 407 U.S. at 109, and the Buffer Law is neutral and generally applicable. Mr. Nicodemus' main argument rests on the theory that it affords Officers unbridled discretion, but this fails on many grounds and is based on pure speculation that will not support a facial challenge. As such, this Court should apply rational basis review, which the Buffer Law easily passes. However, it would still be constitutional even under intermediate or strict scrutiny.

**A. Rational basis scrutiny applies to the Buffer Law, which it easily passes.**

**1. The Buffer Law is generally applicable.**

First, the Buffer Law is generally applicable, applying to *anyone* who "knowingly or intention-

ally" disobeys an Officer's order under the statute. IC § 35-44.1-2-14. It does not "invite the government to consider the particular reasons for [the] person's conduct[,]" *Fulton*, 141 S. Ct. at 1877, or permit non-press conduct while restricting press conduct, *see id.* It is "not aimed at the exercise of . . . press rights as such," so it does not "offend the First Amendment simply because [its] enforcement . . . has incidental effects" thereon. *Alvarez*, 679 F.3d at 601 (citations omitted); *see also Spiegel*, 916 F.3d at 618 ("a person can . . . videotape in a sufficiently disruptive way that it would be not unconstitutional to arrest the individual . . . ." (Citation omitted)).

**2. The Buffer Law is neutral.**

Mr. Nicodemus does not claim the Buffer Law is not general, *see generally* PI Mem., but argues instead it is non-neutral, giving Officers unconstitutional discretion. However, not only does police policy preclude any such discretion, but even absent this policy, the sort of discretion complained of is not prohibited by the First Amendment, so this argument would fail anyway.

This issue is readily resolved by the fact that the South Bend Police Department ("**SBPD**") has a policy directly on point. *See supra* Part II.A.2.c. SBPD Policy 425.2 states, "[SBPD] recognizes the right of persons to lawfully record members of this department who are performing their official duties. Members of this department will not prohibit or intentionally interfere with such lawful recordings. . . ."[4] SBPD Policy Manual. Mr. Nicodemus fails to (**1**) account for the limiting constructions of LE policies, which remove all discretion to discriminate against the press, and (**2**) show any such discrimination in implementation, so his challenge fails.

Similarly, Mr. Nicodemus gives no reason to doubt LE agencies construe the Buffer Law as

---

[4]SBPD's policy also recognizes that interference with the legal duties of Officers occurs when citizens are "so close to [police] activity as to present a clear safety hazard to the officers" or "so close to the activity as to interfere with an officer's effective communication with a suspect or witness," SBPD Policy Manual, Ex. 3, Policy 425.3(b)(3)–(4), and does not permit individuals recording police activity to "present an undue safety risk to the officer, him/herself or others," *Id.* at Policy 425.3(c). This only evinces further the *removal* of discretion entailed by the Buffer Law: it removes discretion from Officers in determining what it means to be *too* "close."

enforceable only during investigations (the most likely construction, since the violation is called "unlawful encroachment on an investigation," IC § 35-44.1-2-14), another limit on discretion.

This aside, Mr. Nicodemus is simply incorrect about the analytical framework. He complains of discretion in determining "whether an individual may remain within twenty-five feet . . . ," *id.* at 13. But the question is not whether a law grants discretion that may have some incidental and insubstantial effect on expressive activity, but whether it grants discretion to "*deny* expressive activity." *Ward*, 491 U.S. at 793 (emphasis added) (citation omitted); *supra* Part II.A.2.a–b.

There is no right to be within 25 feet of an Officer, nor is doing so *after* being told by LE to move back "commonly associated with" press activity, *Lakewood*, 486 U.S. at 760. So the Buffer Law poses no "real and substantial" censorship threat, *Weinberg*, 310 F.3d at 1044 (citation omitted), thus has no sufficient "nexus." And as it (**1**) does not permit Officers to demand recording cease (**2**) *limits* discretion, *infra* Parts III.B.2, III.B.4, and (**3**) allows *anyone* to be at an easy recording distance, Dr. Richard Celeste, Police Practices and Procedures Analysis Regarding Indiana Code § 35-44.1-2-14 ("**Celeste Report**"),[5] Celeste Decl. Ex. A, 18–19, not only is any such perceived threat far from "substantial," the nexus is not even close, *see Weinberg*, 310 F.3d at 1044. Expressive activity is hardly encroached upon. Furthermore, there is no nexus since the interests the law supports are "unrelated to the suppression of free expression." *Playtime Theatres*, 475 U.S. at 48; *infra* Part III.B.2.

That the Buffer Law will be abused is hollow speculation. Since Mr. Nicodemus cannot even show the law *permits* unbridled discretion, *a fortiori*, he cannot show a substantial number of its applications will use such (non-existent) discretion unconstitutionally. However, that is precisely what he *must* show, as he does not allege it lacks a "plainly legitimate sweep." *Washington State*

---

[5] Dr. Celeste's lengthy credentials are described below. *Infra* Part III.B.2. His methodology and expertise is further supported in his declaration. *See* Declaration of Dr. Richard Celeste ("**Celeste Decl.**").

*Grange*, 552 U.S. at 450, 450 n.6. But he gives no reason to believe a substantial number of LE agencies would implement the Buffer Law unconstitutionally. On the contrary: he was not charged and does not allege Officer reference to the law was improper, *see generally* PI Mem., so his own experience demonstrates it *will be* implemented constitutionally. SBPD's policy is similar to policies across the country, *e.g.*, Celeste Report 18, so it likely reflects the manner in which most, if not all, of Indiana's LE agencies will implement the law.

Since the Buffer Law is neutral and generally applicable, affording only properly limited discretion, it need only have a rational basis. The law achieves numerous compelling interests, *infra* Part III.B.2, so this is easily met. Mr. Nicodemus is thus unlikely to succeed on the merits.

**B. The Buffer Law satisfies both intermediate and strict scrutiny.**

The application of rational basis scrutiny should resolve the issue, since the Buffer Law does not implicate constitutional concerns. Nonetheless, it passes muster even if the Court applies greater scrutiny. If so, the Court should apply intermediate scrutiny, since the law restricts only the place in which press activity occurs. Being narrowly tailored to substantial and compelling interests, which would otherwise "be achieved less effectively," *Ward*, 491 U.S. at 791, 798–99 (citations omitted), it easily withstands such scrutiny. In fact, it satisfies even strict scrutiny, being the least restrictive means to reasonably achieve those compelling interests.

**1. The Buffer Law is neutral, and a *de minimus* regulation of the place of press conduct.**

As established, the Buffer Law is content neutral. *Supra* Part III.A.2. A word further is appropriate on its *generality*. This law is unlike the typical place-oriented TPM Regulation, which wholly and *directly prevents* First Amendment activities in a given place. Instead, it requires only 25 feet between Officers and citizens, essentially the short distance between two highway lanes. Celeste Report 19. This *de minimus* brushing on press activity differs in kind

**Joint Resp. in Opp. to PI Mot.**                    17

from the burdensome laws typically treated as TPM Restrictions, which is another reason to apply only rationale basis scrutiny, recognizing that the law has only incidental press effects that do not trigger First Amendment scrutiny, *Lund*, 956 F.3d at 947. But if intermediate scrutiny is applied, there can be little dispute that the 25 foot buffer is a *de minimus* restriction.

**2. The Buffer Law serves numerous compelling and substantial interests.**

This restriction serves at least ten substantial or compelling interests. Dr. Celeste, whose expert report supports this, is an expert in "[LE] training, criminal justice, [and] police practices and procedures[.]" Celeste Report, 3. He directed a lauded police academy for over 30 years, Dr. Richard Celeste C.V., Celeste Decl. Ex. B., 4, 6, taught graduate courses, *id.* at 1, and has ample other qualifications, *see generally id.*, and honors, *id.* at 9–10. He has served as an expert in over 200 cases, including court qualifications. Expert Witness/Consultant Experience, Celeste Decl. Ex. B., *passim*. His report shows the following interests are well-served by buffer laws:

**State Interest:**

**(1)** "[P]ublic safety . . . [is a] compelling interest[]." *United States v. Bonin*, 932 F.3d 523, 535 (7th Cir. 2019). The Buffer Law serves public safety by providing safety to arrestees, ensuring anyone wishing "to harm the arrestee [is] put at a reasonable distance," Celeste Report 5; protecting victims' "right to be free from . . . harm[]," *id.* at 6, 18–19; and "protect[ing] . . . citizens from harm" in an active crime scene, *id.* at 19. *See also infra* State Interest 7.

**(2)** "[P]rotecting the integrity of government processes is compelling." *Bonin*, 932 F.3d at 535. Beyond the integrity preserved under the other State Interests, the Buffer Law preserves crime scenes, which is essential to protecting investigations' integrity. Celeste Report 7–8.

**(3)** There is a "compelling public interest in encouraging citizens to report criminal activity." *Petr ex rel. Est. of Burton v. J.C. Penney Corp.*, No. 1:11-CV-00825-RLY, 2012 WL 3052840, at

*3 (S.D. Ind.). The Buffer Law does so by preventing others from being "at a distance that embarrasses . . . or marginalizes the victim," Celeste Report 6, which will naturally dissipate any animosity, leading victims to be more open to police. It also prevents dissuasion from doing so due to nearby filming that could capture embarrassing or endangering disclosures. *See id.* at 20 (too-close "live streaming" may "captur[e] video and audio of a victim of a crime . . . .").

**(4)** Finding and convicting law-violators is a compelling interest. *Howes v. Fields*, 565 U.S. 499, 514 (2012). In addition to preserving crime scenes and encouraging reporting (both discussed above), the Buffer Law serves this interest by preserving Officer safety (discussed further below), Celeste Report 8–16; and ensuring Officers do not hesitate, due to uncertainty whether the law supports them, to establish a perimeter when necessary to aid in apprehension, because it *removes* discretion and ensures Officers can perform their duties without stopping to second-guess whether a perimeter will be challenged and found unconstitutional, *see id.* at 18.

**(5)** Crime investigation is a compelling interest. *United States v. Blackman*, No. 18-CR-00728, 2023 WL 3346822, at *4 (N.D. Ill. 2023) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175–76 (1991)). The Buffer Law serves this interest as discussed in State Interests 2–4, *supra*.

**(6)** "[R]educing crime is a substantial . . . interest[.]" *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 435 (2002). The Buffer Law serves this interest as discussed in State Interests 2–4, *supra*. By establishing a buffer from would-be assailants, it also prevents additional crimes against those who might otherwise become victims, Celeste Report 18–19; *see also id.* at 8–16.

**(7)** The state has a "significant[6] interest[] in the safety of " Officers. *Bauer v. Armslist, LLC*, 572 F. Supp. 3d 641, 666 (E.D. Wis. 2021), *aff'd sub nom. Webber v. Armslist LLC*, 70 F.4th 945 (7th Cir. 2023). The Buffer Law serves this interest by ensuring Officers will not have "difficulty

---

[6]The terms significant interest, important interest, and substantial interest are equivalent. *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 100 F.3d 175, 189 n.14 (1st Cir. 1996) (citation omitted).

maintaining safety if" someone "at a close distance" wishes to harm them. Celeste Report 16.

This concern cannot be overstated. A 25 foot buffer between an Officer and someone running at full speed provides under three seconds to prepare, *id.* at 14, and reaction time will be reduced, rendering those seconds critical, *id.* at 14–16. In 2021, "43,649 [O]fficers were assaulted [on duty] in 2021," generally while pursuing compelling interests—responding to disturbance calls, attempting arrests, maintaining prisoner custody. *Id.* at 11–12. Such assaults lead to the death of Officers in the line of duty—in 2019, for example, "46 officers died as a result of felonious acts." *Id.* at 10. Nearly 75% of such assaults are with hands or feet, *id.* at 12, so a buffer zone could have prevented them. These shocking statistics continue year after year. *Id.* at 8–13.

**(8)** Police have "a substantial interest in making [] arrest[s] safely and without interference." *United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013). Beyond the already-discussed ways in which the Buffer Law promotes safety, it serves the "without interference" aspect by assuring that press members do not hinder moving arrestees to LE or medical transport. Celeste Report 19.

**(9)** There is "a substantial privacy interest" in protecting the information of "third part[ies] who may wish to keep secret the fact that they were targeted in a criminal investigation" or who were "witnesses [or] informants[.]" *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 978 F. Supp. 2d 1, 9 (D.D.C. 2013) (cleaned up; citation omitted). The Buffer Law serves this interest through the means discussed in State Interest 3 (citing Celeste Report 6, 20).

**(10)** Finally, there is a substantial "interest in administrative efficiency[.]" *Dixon v. Love*, 431 U.S. 105, 114 (1977). The Buffer Law serves this interest. Were Officers required, whenever needing to ask bystanders to move, to determine whether doing so would serve any of the long list of substantial or compelling state interests with which their duties constantly intersect, and *then* to determine how many feet would properly serve those interests, they would have little time

**Joint Resp. in Opp. to PI Mot.**                    20

to actually perform the duty. *See* Celeste Report 18. By removing these questions and the discretion that comes with them, the Buffer Law aids Officers in efficiently administering duties.

25 feet is the bare minimum distance necessary to serve all of the safety-related state interests, because an individual can cover "25 feet in just over 3 seconds" when *walking*, Celeste Report, 14 (citation omitted). Running will obvious reduces this time drastically. *See id.* So safety concerns surely demand a minimum 25-foot buffer zone. *Id.* at 19.

Notably, this enumeration demonstrates how grievously Mr. Nicodemus errs in asserting that "interfere[nce] with police activities" is the only evil the Buffer Law prevents. PI Mem. 14. The ills prevented by the statute include not only that (which prevention itself aids investigations, crime scene integrity, arrests, and reporting), but also physical danger to the public and Officers, and danger to privacy interests, among the many other benefits this law provides, as listed.

### 3. The Buffer Law is properly tailored.

The Buffer Law is narrowly tailored: it does not burden more expressive activity than necessary to serve these interests and provides ample alternative avenues. *Ward*, 491 U.S. at 799.

A TPM Restriction "need not be the least restrictive" means. *Id.* at 798.[7] The Buffer Law presents a *de minimus* burden on press activity, *supra* Part III.B.1; *see also* Part III.A.2, and *at least* this minimal burden is necessary to achieve the interests listed above, *supra* Part III.B.2, so it is necessary to further substantial interests, and burdens no more press activity than necessary.

As such, the statute would pass muster even if it established a larger buffer zone. The 25-foot buffer, however, establishes a necessary *minimal* (**1**) distance between Officers and individuals who would do them harm, or (**2**) would infringe the privacy of a witness wishing not to be heard;

---

[7]Mr. Nicodemus asserts that narrow tailoring means the statute "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.'" PI Mem. 14 (quoted source omitted). However, *Ward* is clear that this "least-restrictive-alternative analysis is wholly out of place" in the TPM Restriction context. 491 U.S. at 798 n.6.

(**3**) protection to citizens who would otherwise be in the line of danger; and (**4**) protection for the integrity of crime scenes (whose exact perimeter may not be known to Officers initially).

Because 25 feet is the minimum necessary distance to adequately protect these interests, the Buffer Law does not burden substantially more press activity than necessary. Indeed, 25 feet will almost never prevent the press from capturing the desired footage,[8] Celeste Report 17, 23, so there will almost always be alternative avenues. Mr. Nicodemus simply misapprehends the law in claiming it will prevent the press "from being able to see, perceive, and record" events, PI Mem. 15–16, for it does not permit Officers to construct a visual barricade, nor even to command press to go around a tight corner. Thus, *every square inch* of public space that is more than this short distance from a Officer—and only one who has invoked the Buffer Law in the first place—is an alternative avenue. "The more [alternative avenues], the more likely the restriction is reasonable," *Stokes v. City of Madison*, 930 F.2d 1163, 1172 (7th Cir. 1991), so there is little question that this criterion is satisfied. On top of these limitless avenues, the potential for using video drones and the availability of "body cam" footage provide further alternative avenues.

**4. The Buffer Law is the least restrictive means.**

Even under strict scrutiny, proposed less-restrictive alternatives must be reasonable. *CBS Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975) (citing *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183; *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)). Deference is granted to the legislature regarding the distance needed for buffer zones. *Burson*, 504 U.S. at 208–09 ("'Legislatures . . . should be permitted to respond to potential [threats to compelling interests]

---

[8]"[T]he protection of personal conversational privacy" is not only an "important governmental interest," but actually "serves First Amendment interests because fear of public disclosure of private conversations might well have a chilling effect on private speech." *Alvarez*, 679 F.3d at 605; *see also supra* State Interests 3, 9 (pp. 18–20). Accordingly, the fact that 25 feet may prevent recording private conversations is not relevant. Meanwhile, Mr. Nicodemus' own video demonstrates that non-private speech can still be picked up at that distance. *E.g.*, Nicodemus Video at 8:19–8:35 (Officer's directions clearly discernable, even though not directed to Mr. Nicodemus).

with foresight rather than reactively . . . .' The State . . . has decided that the[] last [100 feet] before its citizens enter the polling place should be their own . . . ." (citation omitted)). Furthermore, virtually *all* LE duties directly serve compelling interests, *see supra* Part III.B.2, so it would not be reasonable to have a litany of statutes that each relate to one particular state interest. Indeed, this is likely why courts have long recognized that Officers are simply "entitled to enforce [laws] free from possible interference," *Colten*, 407 U.S. at 109; *Lund*, 956 F.3d at 947, which right the Buffer Law merely hems in with a specific distance, *preventing* discretion.

The PI Memorandum does not allege that the Buffer Law has no constitutional application or lacks a "plainly legitimate sweep." *Washington State Grange*, 552 U.S. at 450. Nor does it make more than a fleeting attempt to demonstrate "impermissibl[e] overbr[eadth] because a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Id.* at 450 n.6 (cleaned up; citations omitted). And this fleeting attempt, based on a theory of unbridled discretion, relies on speculation that Mr. Nicodemus' own experience shows to be fanciful. This Court should decline to entertain such speculation. For this and all the foregoing reasons, Mr. Nicodemus' challenge has a low likelihood of success on the merits.

### IV. A municipal entity may not be liable for the enforcement of state policy.

In *Monell v. New York City Department of Social Services*, the Supreme Court held that a municipal entity may not be liable under Section 1983 unless a municipal policy or custom caused the plaintiff's injury. 436 U.S. 658, 690–95 (1978). The *Monell* policy-or-custom requirement applies equally to both claims for damages and claims for declaratory and injunctive relief. *Los Angeles County v. Humphries*, 532 U.S. 29, 36–39 (2010).

The policy at issue in this action is not a policy of the City of South Bend. Rather, the policy at issue in this action is a policy of the State of Indiana. ECF 1, ¶10, ¶39. The law is settled that a

municipal entity may not be liable for the enforcement of state policy. *See Surplus Store &
Exchange, Inc. v. City of Delphi*, 928 F.2d 788, 790–91 (7th Cir. 1991). In *Surplus Store*, the
municipality was sued because its Officer used authority conferred by a state statute to seize
stolen property and return it to its rightful owner without a hearing to determine ownership. *Id.* at
789–91. The plaintiff argued "that Delphi can be held liable for the deprivation of its property
because Delphi has a 'policy' of allowing or instructing its police officers to enforce the
challenged statutes." *Id.* at 791–92. The Seventh Circuit rejected this argument. *Id.*

The holding of *Surplus Store* is directly controlling here. The City of South Bend may not be
liable under Section 1983 for its Officers using authority conferred by a state statute. *Id.*; *see also
Vasquez v. Foxx*, 895 F.3d 515, 519-20 (7th Cir. 2018), *overruled on other grounds*, *Koch v. Vill.
of Hartland*, 43 F.4th 747, 749 (7th Cir. 2022). Mr. Nicodemus is therefore not likely to prevail
on the merits of his claim, and the Court should deny his PI Motion.

**V. The remaining preliminary injunction factors weigh against the PI Motion.**

The remaining preliminary injunction factors strongly favor denying the PI Motion.
Additionally, because Mr. Nicodemus is likely to fail on the merits, he must show the balance of
harms strongly favors granting it anyway. *Jones*, 842 F.3d at 1059–60. He cannot do so.

As discussed, Mr. Nicodemus has not shown that press activity is likely to be meaningfully
hindered by this statute. *Supra* Part III.B.3; *see also* Parts III.A.2, III.B.1. To the contrary, his
experience shows he *was* able to capture the footage he wanted, since the closest he comes to
even alleging otherwise is that he was "unable to determine" a *different* disturbance than the one
he initially began to film. PI Mot. 5; *compare id.* (he "noted that there was a disturbance . . . on
the *north side* of Lincoln Way West" (emphasis added)); *with id.* at 4 (initial disturbance was "at
the *southwest* corner of the intersection . . . [,] where the shots had been fired." (emphasis

added)). That he might have had to relocate (to *anywhere* other than the 25-foot buffer) in order to capture footage of a *different location*, as press has to do regardless of any law, is not a complaint against the law. No harm will befall Mr. Nicodemus if his motion is denied.

Indiana, however, would be harmed. The Buffer Law supports no less than ten compelling or substantial interests, including public safety, Officer safety, and privacy rights. *Supra* Part III.B.2. The state's concern in upholding these would be gravely harmed were the law enjoined.

Accordingly, the balance of harms falls strongly against enjoining the Buffer Law. As the PI Motion could only have survived upon an extremely strong showing of the opposite since it has little likelihood of success on the merits, there is no remaining rationale for granting same.

## Conclusion

For all the foregoing reasons, the PI Motion should be denied.

Dated: September 26, 2023                    Respectfully Submitted,

Joseph W. Smith, Ind. Bar No. 29663-64     Theodore E. Rokita
KNIGHT, HOPPE, KURNIK & KNIGHT, LTD.       Indiana Attorney General
233 East 84th Drive, Suite 301             Ind. Bar No. 18857-49
Merrillville, IN 46410
JSmith@khkklaw.com                         By:
Phone: 219/322-0830                        /s/ James Bopp, Jr.
Fax: 219/322-0834                          James Bopp, Jr., Ind. Bar No. 2838-84
                                           THE BOPP LAW FIRM, PC
Matthew S. Clark, Ind. Bar No. 33712-45    The National Building
KNIGHT, HOPPE, KURNIK & KNIGHT, LTD.       1 South 6th Street
5600 North River Road, Suite 600           Terre Haute, Indiana 47807
Rosemont, Illinois 60018                   jboppjr@aol.com
mclark@khkklaw.com                         Phone: 812/232-2434
Phone: 847/261-0700                        Fax: 812/235-3685
Fax: 847/261-0714                          *Attorney for Intervenor*

*Attorneys for City of South Bend*

**Joint Resp. in Opp. to PI Mot.**          25

## Certificate of Service

I certify that on this 26th day of September 2023, a copy of the foregoing was filed electronically with the Clerk of this Court and by Notice of Electronic Filing was served on the below-named parties:

Gavin M Rose
grose@aclu-in.org
Stevie J Pactor
 spactor@aclu-in.org
Kenneth J Falk
kfalk@aclu-in.org

ACLU of Indiana
1031 E Washington St
Indianapolis, IN 46202
317-635-4059 Ext 106
Fax: 317-635-4105

Matthew S Clark
Knight Hoppe Kurnik & Knight Ltd - Ros/IL
5600 N River Rd Ste 600
Rosemont, IL 60018-5114
847-261-0700
Fax: 847-261-0714
mclark@khkklaw.com

Joseph W Smith
Knight Hoppe Kurnik & Knight Ltd - Mer/IN
233 E 84th Dr Ste 301
Merrillville, IN 46410
219-322-0830
Fax: 219-322-0834

 /s/ James Bopp, Jr.
James Bopp, Jr.