UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| DONALD NICODEMUS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 3:23-cv-744-DRL-MGG ) |
| CITY OF SOUTH BEND, INDIANA, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| STATE OF INDIANA, | ) ) |
| Intervenor-Defendant. | ) |

**Reply in Support of Motion for Preliminary Injunction**

**Introduction**

At the outset, it is important to stress what this case is not about as the joint response memorandum of South Bend and the State (together "the State") appears to be advocating the constitutionality of a statute radically different than Indiana Code § 35-44.1-2-14, the statute challenged in this case. The question in this case is *not* whether a 25-foot barrier is constitutional when there is (1) a law enforcement and public safety need for the barrier and (2) the statute authorizing the barrier sets out the standards under which such a barrier can be set. Indiana Code § 35-44.1-2-14 does not mandate a 25-foot barrier only where there is a need for the barrier as set out by standards in the statute. Instead, it authorizes officers in their absolute discretion to decide whether or not to permit observation from within 25 feet.[1] The State argues in support of a statute that allows

---

[1] Mr. Nicodemus does not concede that the opinions of Dr. Richard Celeste (Dkt. 25-6), concerning different reasons why it could be reasonable to require persons to be physically removed from police activity, are admissible as reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence. However, these opinions are not admissible as they are not relevant to

[1]

police to request that persons, including citizen-journalists, remove themselves from police activity when the persons might reasonably obstruct or interfere with the police. But that is not Indiana Code § 35-44.1-2-14, a statute that allows police to prevent close observation of police activity for any reason, or for no reason at all.

Contrary to the State's argument, Mr. Nicodemus is not arguing that there is a "near-limitless right to record Officers." (Dkt. 25 at 8). Mr. Nicodemus does not contend that any person, citizen-journalist or not, has the unfettered right to approach within 25 feet of police activity. Police might sometimes need to limit an individual's approach to ensure public safety, to conduct a proper investigation, or for a host of other reasons. Undoubtedly, that is why Indiana law already prohibits actual interference with police lawfully engaged in law-enforcement activities, Ind. Code § 35-44.1-3-1(a), and prohibits entering emergency incident areas, Ind. Code § 35-44.1-4-5. On the other hand, there are times when approaching within 25 feet will pose no problem for law enforcement and when precluding such approach will prevent citizens from seeing, hearing, and reporting on what the police are doing—all activities protected by the First Amendment.

Therefore, the question here, obscured by the State's arguments, is whether the statute, which contains no standards and which directly impinges upon First Amendment rights, can be upheld. The statute is the quintessential example of the unbridled discretion that violates the First Amendment. South Bend is liable for this violation and a preliminary injunction should be entered.

**The relevant facts are uncontested**

Although the State belabors the facts of Mr. Nicodemus's interaction with the police on July

---

answering the only question in this case: whether a statute is constitutional that gives standardless discretion to police officers to decide whether or not to preclude citizens and citizen-journalists from being within 25 feet of police activity. They should therefore not be considered as the trial judge must ensure that scientific evidence is both reliable and "is relevant to the task at hand." *Id.* at 597.

20, 2023, and the reasons that South Bend Police invoked repetitive 25-foot barriers to move Mr. Nicodemus, the relevant facts are uncontested.

1. Mr. Nicodemus is a citizen-journalist who films police activity in South Bend and posts the videos to his You Tube channel, "Freedom to Film." (Dkt. 20-1 ¶¶ 2-8)

2. On July 20, 2023, Mr. Nicodemus travelled to a scene where shots had been fired and police were investigating and began filming from across the street. (*Id.* ¶¶ 19, 22).

3. After filming for a few minutes, Officer Stepp of the South Bend Police Department ordered that Mr. Nicodemus and others who were watching to move back 25 feet and stepped off the distance, and Mr. Nicodemus moved back. (*Id.* ¶¶ 24, 25, 29).

4. A few minutes later, Officer Veal ordered Mr. Nicodemus and others to move back another 25 feet, threatening arrest if Mr. Nicodemus did not move, indicating that there was a new law in effect, referring to Indiana Code § 35-44.1-2-14. (*Id.* ¶¶ 34-35).

5. Mr. Nicodemus intends to continue his activities as a citizen-journalist and intends to continue to monitor and record activity of the South Bend Police Department and wishes to film from closer than 25 feet, as long as he is not interfering with police activities. However, he does not want to be arrested. (*Id.* ¶¶ 37-39).

6. If Mr. Nicodemus is more than 25 feet away, it may be difficult or impossible to hear and see and ensure that his recording captures what is happening. (*Id.* ¶ 11).[2]

---

[2] Dr. Celeste states in his declaration that "[a]ny inference that police accountability cannot be accomplished at 25 feet of visual observation is a vacuous assertion." (Dkt. 25-6 at 23) (emphasis omitted). This is not a factual assertion that refutes Mr. Nicodemus's statement nor is it an assertion within Dr. Celeste's expertise. Moreover, Mr. Nicodemus's statement is hardly "vacuous." Would we have learned about George Floyd if the young woman who recorded his death from a few feet away (Dkt. 20 at 9-10 n.1) had been moved 25 feet away where she might not have been able to see and, importantly, hear his pleas, which she was able to record? This Court can certainly take judicial notice that at 25 feet it will be more difficult to see, hear, and record events than if one were closer as this is "common knowledge." *See e.g., PPL Montana, LLC v. Montana,* 565 U.S. 576, 593 (2012) (citing earlier case law that "the navigability of a river, speaking generally, is a matter of common knowledge, and hence one of which judicial notice may be taken"); *United States v.*

7.      Another citizen-journalist has had the 25-foot law enforced against him by South Bend Police, even when he was already behind police-erected tape that had moved him some distance away. (Declaration of Robert Perez, Dkt. 31-1, ¶¶ 2-19).

**Argument**

I.      **Plaintiff is likely to prevail on the merits of his claim**

   A.      **Indiana Code § 35-44.1-2-14 directly burdens activity protected by the First Amendment**

The State does not dispute the fact that in videotaping the police Mr. Nicodemus is engaged in activity protected by the First Amendment. As Mr. Nicodemus noted in his earlier memorandum (Dkt. 20 at 8-9), the Seventh Circuit, consistent with numerous other circuits, clearly established this constitutional principle in *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595-96 (7th Cir. 2012). And, as also noted previously, this means that there is a right to get close enough to law enforcement activity to be able to meaningfully observe and record it. *See, e.g., Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102, 1105, 1107 (D. Ariz. 2022) (granting preliminary injunction against an Arizona statute prohibiting video recording within eight feet of law enforcement activity if the person making the recording has been directed to stop). The bottom line is that "peaceful recording . . . in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation." *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011).

The State responds by arguing that the challenged statute only incidentally burdens the First Amendment. (Dkt. 25 at 9-10). It is "true that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health*

---

*LeFevre*, 483 F.2d 477, 479 (3d Cir. 1973) (adopting an American Bar Association standard for prosecutors that makes it unprofessional conduct to argue on the basis of facts outside the record "unless such facts are matters of common knowledge based on ordinary human experience or matters of which the court may take judicial notice").

[4]

*Inc.*, 564 U.S. 552, 567 (2011). In *Alvarez*, in finding that an "eavesdropping" statute that had the effect of prohibiting the recording of police in public implicated the First Amendment, the Court noted that "when 'speech' and 'nonspeech' elements are combined, and the 'nonspeech' element . . . triggers the legal sanction, the incidental effect on speech will not normally raise First Amendment concerns." 679 F.3d at 602.

The burden here is not incidental. "Burdens on speech are 'incidental' only when they flow indirectly from the core purpose of the regulation." *K.C. v. Indiv. Members of Med. Licensing Bd. of Ind.*, 2023 WL 4054086, at *12 (S.D. Ind. June 16, 2023), *appeal pending*, No. 23-2366 (7th Cir.). The "core purpose" of the statute here is to prevent persons from getting close enough to observe and obtain information about police activity. Of course, the right to observe is not limited to self-described "citizen-journalists" like Mr. Nicodemus. Given the ubiquitousness of cell phones, these "changes in technology and society have made the lines between private citizen and journalist exceedingly difficult to draw. The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders." *Glik*, 655 F.3d at 84. We are all potential citizen-journalists with an interest in observing law enforcement and, where appropriate, publicizing what we capture. Every individual who witnesses police activity stands to be burdened by the statute's impact on their ability to observe and record or report those activities.

> [S]ince the First Amendment protects the right to criticize police, then *a fortiori* it protects the right to remain in the area to be able to criticize the observable police conduct. Otherwise, an officer could easily stop the protected criticism by simply asking the individual to leave, thereby forcing them to either depart (which would effectively silence them) of face arrest. This would render the right to criticize hollow and would implicate various other protected rights, like the right to film public police activity.

*Jordan v. Jenkins*, 73 F. 4th 1162, 1169-70 (10th Cir. 2023); *see also, e.g., Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information

about what public officials do on public property, and specifically, a right to record matters of public interest."). The core of the challenged statute—the ability to remove persons from where they can closely observe police—directly, not incidentally, burdens the First Amendment right to observe and gather information.

*City of Houston, Tex. v. Hill,* 482 U.S. 451 (1987), further demonstrates that the First Amendment harm caused by the challenged statute is hardly incidental. In *Hill* the Court affirmed that an ordinance making it illegal to interrupt police officers in the performance of their duties was unconstitutionally overbroad in violation of the First Amendment. *Id.* at 453. The Court rejected the argument that the ordinance dealt only with criminal conduct not protected by the First Amendment, because although it certainly applied to non-expressive conduct, it also prohibited verbal interruptions of the police in situations where "[t]he Constitution does not allow such speech to be made a crime." *Id.* at 462. This was not a generally applicable law focused only on obstructive conduct, with only an incidental impact on First Amendment rights. (*See* Dkt. 25 at 8, citing *Lund v. City of Rockford, Ill.*, 956 F.3d 938, 947 (7th Cir. 2020)). Instead, the ordinance was "susceptible of regular application to protected expression" 482 U.S. at 467.[3] It imposed a direct burden on First Amendment activity, as does the challenged statute here.[4]

---

[3] The Supreme Court's recognition that a statute can be directed at conduct, yet also have a direct burden on First Amendment expression, is further demonstrated by *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), where a challenge was made to a statute that prevented the provision of material support or resources to a foreign terrorist organization. *Id.* at 7. The plaintiffs argued that they wished to train a designated foreign terrorist organization on how to use international law, to petition international bodies, and to engage in political advocacy. *Id.* a 14-15. The Court rejected the government's argument that the law only incidentally burdened the plaintiffs' expression because it prohibited conduct. *Id.* at 26-27. Even though the law "generally functions as a regulation of conduct," as it is "applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message," *id.* at 27-28, thereby demanding the most exacting scrutiny.

[4] Even if the statute is deemed to have only an incidental burden on expression, it would still be subject to the intermediate scrutiny applied to content neutral burdens on speech. *See infra* at 10; *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968). As noted below, Indiana Code § 35-44.1-2-14 fails intermediate scrutiny.

[6]

**B.     The statute is not content neutral as it vests unbridled discretion in officers to determine if expressive activity may occur, and it violates the First Amendment**

The State does not disagree that in a public forum, regulations impinging on First Amendment activities are unconstitutional unless they are content neutral, are narrowly tailored to serve an important governmental interest, and leave open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Nor does the State disagree that a statute or regulation granting unbridled discretion to determine whether or not expressive activity can occur is not content neutral. *Smith v. Executive Director of Ind. War Memorials Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014); *Southworth v. Bd. of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 578-79 (7th Cir. 2002). Nor can the State deny that Indiana Code § 35-44.1-2-14, which contains no standards whatsoever, vests unbridled discretion in individual officers as to whether or not to allow persons to approach, observe, and record them—activities protected by the First Amendment.

The State notes that unbridled discretion is most frequently an issue in permitting cases. (Dkt. 25 at 11). That may be, but unbridled discretion is an issue whenever government authorities may determine—without constraint by any standards—whether or not to allow conduct protected by the First Amendment. In *Minnesota Voters Alliance v. Mansky*, 585 U.S. __, 138 S. Ct. 1876 (2018), the Court struck down a law that restricted voters in polling places from wearing political matters on their clothing because the election judges granted enforcement authority were not "guided by objective, workable standards." *Id.* at 1891. Like this case, *Mansky* is not about permits, but is about permission to engage in actions imbued with the protections of the First Amendment. And in *Hill*, the Court noted that enforcement of the ordinance prohibiting interference with the police was subject to the "unguided discretion" of law enforcement and this represented "unconstitutional discretion" in its enforcement. 482 U.S. at 466-67.

The State argues against the application of the unbridled discretion analysis here by citing to *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), where the Court held that "laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken, carry with them little danger of censorship." *Id.* at 760-761 (Dkt. 25 at 11). But here the law is directly aimed at conduct protected by the First Amendment and associated with expression—the right to observe and record police. And the law permits an individual officer to make the determination of whether such expressive conduct can occur on the basis that the officer would prefer not to be observed, even if there would be no danger, interference, or other harm if the observer were closer than 25 feet from the officer. Mr. Nicodemus may be removed to a distant location, while someone else who is perceived as favorable to the police may be allowed, in an identical situation, to come closer. This is the precise danger manifested by unbridled discretion as it "confers on police [ ] virtually unrestrained power." *Bd. of Airport Com'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987) (internal citation omitted). This is not a hypothetical danger, for the facts here demonstrate that when Mr. Nicodemus was directed to move further and further away from police, other persons not attempting to record or observe police activity—those passing by in vehicles—were allowed closer to police officers. (Dkt. 20-1 ¶ 30).

The State contends that being required to move 25 feet away is, at best, a minimal burden that "hardly affects" First Amendment rights. (Dkt. 25 at 12). Twenty-five feet is a significant distance that interferes with the ability to see and hear. Moreover, "[t]he First Amendment mandates that we presume the speaker, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed. of the Blind of N.C., Inc.* 487 U.S. 781, 790-91 (1988). It is up to Mr. Nicodemus and other persons to decide how they wish to exercise their First Amendment rights, provided they

[8]

do not interfere with law enforcement.

The State seeks to mitigate the unbridled discretion granted by the challenged statute by citing to the South Bend Police Department's internal policies that recognize the right to "lawfully record" police officers, but prohibit citizens from getting so close to officers as to cause a concern about safety or interference. (Dkt. 25 at 15). The State does not explain how internal policies, which are subject to change and lack the force of law, can cure a facially unconstitutional statute. Moreover, granting the right of citizens to "lawfully record" and prohibiting their interference with the police does not render constitutional a statute that allows a 25-foot barrier to be erected without any standards. The State's argument that one should presume that law enforcement will enforce the law in a constitutional manner fares no better. (Dkt. 25 at 15-16). As the Supreme Court has noted, it simply cannot be presumed that government actors "will act in good faith and adhere to standards absent from the [statute]'s face [as] this is the very presumption that the doctrine forbidding unbridled discretion disallows." *City of Lakewood*, 486 U.S. at 770.

Therefore, contrary to the State's argument, the statute is far from content neutral. A content-based impingement on First Amendment rights can be upheld only if it is narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015). The State notes that there are rare cases where content-based regulations of speech are upheld as supported by a compelling governmental interest. (Dkt. 25 at 14). However, the State cites no cases upholding a statute or regulation that impacts First Amendment rights and grants unbridled discretion to government actors to limit or deny the First Amendment activities. The grant of unbridled discretion to allow First Amendment activities renders the challenged policy facially unconstitutional. *See, e.g.*, *DeBoer v. Village of Oak Park,* 267 F.3d 558, 572 (7th Cir. 2001).

Certainly, while it is true that "the freedoms protected by the First Amendment are not

absolute and must yield to the compelling interest of the state in its protection of the safety and the welfare of the public," it is also true that "this state interest can only be served through regulations providing narrow, objective, definite standards, so that the licensing of protected activities is not left to the unbridled discretion of government authorities." *Hall v. McNamara*, 456 F. Supp. 245, 247 (N.D. Cal. 1978) (quotation and citations omitted). Of course, "municipalities [are not] powerless to punish physical obstruction of a police action," but the conduct can only "be punished under a properly tailored statute, such as a disorderly conduct statute that make it unlawful to fail to disperse in response to a valid police order or to create a traffic hazard." *Hill*, 482 U.S. at 463 n.11. Indiana has such a statute, Indiana Code § 35-44.1-3-1, creating an offense for obstructing or interfering with law enforcement while the officer is lawfully engaged in his or her duties. Indiana also has a statute that allows police to set up a 25-foot "emergency incident area" when there is an actual emergency incident. Ind. Code §§ 35-44.1-4-1.5, 2, 5.

But the challenged statute contains no such standards and, by definition, a standardless statute is not narrowly tailored, as standards can be added to constrain discretion. And there is no state interest that is served by a statute allowing First Amendment rights to be compromised based solely on the discretion of the government actor and without requiring any cause whatsoever. Again, this is not a case about a tailored statute that requires a person to stay a certain distance away when there is obstruction of police action. The statute is not at all tailored to meet any interest. Mr. Nicodemus is therefore likely to show that Indiana Code § 35-44.1-2-14 violates the First Amendment.

    **C.**    **The statute also fails intermediate scrutiny as it is not narrowly tailored**

The statute is not content neutral and there is no reason to go further. However, even if the statute is deemed to be content neutral as only having an incidental burden on speech, it still must meet intermediate scrutiny that applies when the government's "regulation is not related to

expression." *Texas v. Johnson*, 491 U.S. 397, 403 (1989). Both the time-place-and-manner scrutiny in *Ward* and the four-part test of *O'Brien* require that content-neutral burdens on speech or expressive conduct further a significant or important governmental interest and the burden must be no greater than necessary to further that interest. *Ward*, 491 U.S. at 791, 799; *O'Brien*, 391 U.S. at 376-77. The State, citing a case involving a statute that the court concluded had no First Amendment implications at all, argues that rational basis is the test that must be met. (Dkt. 25 at 13, citing *Dahlstrom v. Sun-Times Media*, *LLC.*, 777 F.3d 937, 948-49 (7th Cir. 2015)). By contrast, here the statute certainly does limit conduct imbued with First Amendment protection even if one accepts the State's argument that the limitation is "incidental" and "unrelated to the suppression of free expression." *O'Brien*, 391 U.S. at 377. At worst, intermediate scrutiny applies.

The State argues, at length, that the statute furthers "numerous compelling and substantial interests" and a 25-foot buffer zone is appropriate. (Dkt. 25 at 18-22). But the State never addresses the actual question in this case: is a statute that allows police officers to erect a 25-foot buffer, or repetitive 25-foot buffers, at their unfettered discretion and with no justification, properly tailored to meet an important governmental interest, regardless of how important the interest is? The statute allows an officer to erect a 25-foot barrier from himself for no reason if he is merely approached by Mr. Nicodemus while walking down the street; is that appropriately tailored? The question is not just whether there are legitimate interests that might necessitate under specific circumstances a 25-foot buffer, but whether the statute "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. In other words, does the statute "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz,* 487 U.S. 474, 485 (1988) (citation omitted).[5] Clearly, a properly tailored statute prohibiting interference

---

5       The State repeats this quotation, without citing its source, and states that "this 'least-restrictive-

with all the important public safety functions of the police, but otherwise allowing the public to approach and observe, would be constitutional. But a statute cannot be properly tailored if it grants unbridled discretion to those enforcing it. *See, e.g., Outdoor Systems, Inc. v. City of Mesa*, 997 F.2d 604, 613 (9th Cir. 1993) ("As an application of the time, place, and manner restriction requirement that ordinances by narrowly tailored, a law cannot condition the free exercise of First Amendment rights on the unbridled discretion of government officials." [quotation and citation omitted]).

At no point does the State explain how a properly tailored statute—one focused on allowing a barrier only when there is a necessity to do so and criminalizing persons who refuse to comply—is not possible. As noted, Indiana law already allows emergency incident areas to be erected when there is an actual emergency incident. Ind. Code §§ 35-44.1-4-1.5, 2, 5. And Indiana law already makes it a misdemeanor if a person "knowingly or intentionally . . . obstructs [ ] or interferes with a law enforcement officer." Ind. Code § 35-44.1-3-1(a). These statutes focus on actual reasons to keep people away from police and actual interference with law enforcement, tailoring that is completely lacking in Indiana Code § 35-44.1-2-14. The failure of the challenged statute to contain any requirement that the 25-foot barrier be based on legitimate need renders it not narrowly tailored, and it is unconstitutional even under intermediate scrutiny.

    **D.**    **The City may be held liable under *Monell***

Relying on *Surplus Store & Exchange, Inc. v. City of Delphi*, 928 F.2d 788 (7th Cir. 1991), the State argues that South Bend not be held liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for its enforcement of a state statute. (Dkt. 25 at 23-24). The State errs.

---

alternative analysis is wholly out of place'" in the reasonable, time, place, and manner analysis that is intermediate scrutiny. (Dkt. 25 at 21). *Frisby* is an intermediate scrutiny case, analyzing a content-neutral ordinance, and the Court was applying time, place, and manner analysis. 487 U.S. at 481-82.

[12]

The point of *Surplus Store*—as well as the Seventh Circuit's subsequent decisions in *Bethesda Lutheran Homes & Services, Inc. v. Leean*, 154 F.3d 716, 718-19 (7th Cir. 1998) ("*Bethesda Lutheran II*"), and *Snyder v. King*, 745 F.3d 242, 246-48 (7th Cir. 2014), neither of which is cited by the State—is that, when a municipality is *compelled* to act by state law, it cannot be held liable for taking action that it was required to take. *Surplus Store* concerned a state statute that did not establish a pre-deprivation hearing when certain property was seized by law enforcement officers, *see* 928 F.2d at 790-91; *Bethesda Lutheran II* concerned a series of state statutes that afforded certain preferences regarding long-term care alternatives to in-state residents, *see Bethesda Lutheran Homes & Services, Inc. v. Leean*, 122 F.3d 443, 444 (7th Cir. 1997); and *Snyder* concerned a state statute mandating the removal of incarcerated convicts from the voter rolls, 745 F.3d at 244. Concluded the Seventh Circuit in *Bethesda Lutheran II*:

> The plaintiff who wants a judgment against [a] municipality under [§ 1983] must be able to trace the action of the employees who actually injured him to a policy or other action of the municipality itself. When the municipality is acting under *compulsion* of state or federal law, it is the policy contained in that state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury.

154 F.3d at 718 (emphasis added). And this makes sense, for *Monell* only subjects to liability a government actor who has made a "deliberate choice to follow a course of action . . . from among various alternatives." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

The problem for the State is that this line of cases does not prevent municipal liability when it has discretion under state law to act or refrain from acting. This is clear from *Bethesda Lutheran* itself, which recognized the distinction articulated in *Garner v. Memphis Police Department*, 8 F.3d 358 (6th Cir. 1993), "between the state's command (which insulates the local government from liability) and the state's authorization (which does not)." 154 F.3d at 718. *Snyder* highlighted the same distinction, suggesting that a municipality may be held liable when it takes action that is "merely

[13]

authorized, not compelled, by state law." 745 F.3d at 248 (internal quotation omitted). The "essential question" thus "asks whether [a municipality] could have chosen not to use [its] authority under the state statute and how [it] would use such authority; if [it] could have opted to act differently, or not to act," it may be held liable. *Brotherton v. Cleveland*, 173 F.3d 552, 566 (6th Cir. 1999) (citing, *inter alia*, *Bethesda Lutheran II*, 154 F.3d at 718). Another district court in this circuit has similarly observed that "the question under *Bethesda Lutheran* is whether the municipality enforcing a state law has enough discretion in implementation to make the municipality 'responsible' for any constitutional violation that occur[s]." *N.N. v. Madison Metro. Sch. Dist.*, 670 F. Supp. 2d 927, 936 (W.D. Wis. 2009); *see also Buquer v. City of Indianapolis*, 2013 WL 1332158, at *16 n.13 (S.D. Ind. Mar. 28, 2013).[6]

There can be no doubt that the City has the authority to determine whether, when, and how to enforce Indiana Code § 35-44.1-2-14: when its officers direct Mr. Nicodemus (or anyone else) not to "approach[] within twenty-five (25) feet," they are not "acting under compulsion of state or federal law," *Bethesda Lutheran*, 154 F.3d at 718. In fact, as underscored previously, the discretion the statute affords law enforcement officers is the very point of Mr. Nicodemus's First Amendment claim. Having made the discretionary decision to enforce a discretionary statute, South Bend may be held liable under *Monell* and its progeny.[7]

## II. The other requirements for the grant of a preliminary injunction are met

---

[6] Other circuits follow the same rule. *See Vives v. City of New York*, 524 F.3d 346, 353-55 (2d Cir. 2008) (cited with approval in *Snyder*, 745 F.3d at 248); *Cooper v. Dillon*, 403 F.3d 1208, 1222-23 (11th Cir. 2005) (same); *see also Brewster v. City of Los Angeles*, __ F. Supp. 3d __, 2023 WL 3374458, at *72-76 (C.D. Cal. May 9, 2023); *Lederman v. United States*, 2007 WL 1114137, *3 (D.D.C. Apr. 13, 2007).

[7] The City's *Monell* argument, of course, has no applicability to the State. Having intervened, the plaintiff may "obtain relief against the [State] even if the original defendant is eliminated from the lawsuit." *Dist. of Columbia v. Merit Sys. Protection Bd.*, 762 F.2d 129, 132 (D.C. Cir. 1985).

Mr. Nicodemus will prevail on the merits of his claim and is threatened with denial of his First Amendment rights. As noted in his prior memorandum, the law is well-established that the loss of First Amendment freedoms, even briefly, is irreparable injury for which there is no adequate remedy at law. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Neither defendant will be harmed by an injunction. Indiana law already has in place statutes that prevent entry into areas where there are reasons to keep out the public and prevent disruption of police activity and ensure public safety, Ind. Code §§, 35-44.1-3-1(a), 35-44.1-4-2. Therefore there will be no harm in issuing the preliminary injunction against the challenged statute, Indiana Code § 35-44.1-2-14. Moreover, the defendants and the public have no interest in compromising First Amendment freedoms. *Id.* at 859, 867.

## Conclusion

As noted, the question here is not whether there are times when it is necessary and appropriate to move persons back from law enforcement activity and to cite persons if they fail to comply with the demands of law enforcement. The question is whether Indiana Code § 35-44.1-2-14, which allows officers in hundreds of law enforcement agencies throughout Indiana to issue such orders at their discretion without any standards constraining them, is constitutional given the statute's clear burden on First Amendment activities. Plaintiff is likely to demonstrate that the statute is unconstitutional, and as all the other requirements for the grant of a preliminary injunction are met, one should issue, without bond, enjoining the enforcement of Indiana Code § 35-44.1-2-14.[8]

                                                                   Kenneth J. Falk
                                                                   Gavin M. Rose
                                                                   Stevie J. Pactor
                                                                   ACLU of Indiana
                                                                   1031 E. Washington St.

---

[8] The State did not respond to Mr. Nicodemus's argument that the injunction should issue without bond. (Dkt. 20 at 17-18).

Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiff