UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DONALD NICODEMUS,

    Plaintiff,

v.	CAUSE NO. 3:23cv744 DRL

CITY OF SOUTH BEND, INDIANA,

    Defendant.

OPINION AND ORDER

On July 1, 2023, Indiana's so-called buffer law took effect, criminalizing as a misdemeanor a person's unlawful encroachment on a police officer's lawful duties. This buffer law prohibits a person from knowingly or intentionally approaching within 25 feet of an officer engaged in his or her lawful duties after the officer orders the person to stop approaching. *See* Ind. Code § 35-44.1-2-14.

Law enforcement officers have jobs to do, and often difficult jobs that require decisionmaking in tense, uncertain, fluid, and unsafe circumstances. At the same time, the public has a right to record the police. Audiovisually recording police activity fits within the First Amendment's guarantee. The right isn't unlimited, but robustly it exists to serve important purposes. It facilitates transparency, training, scrutiny of police misconduct, and the exoneration of officers from unfair charges. Candid critique of our government and its officials matters in a free society. By shining a light on newsworthy police conduct, the public's recordings benefit our citizens and law-abiding officers alike.

Donald Nicodemus periodically livestreams police encounters to the public on his YouTube channel. He has the right to do so. On July 20, 2023, South Bend police officers moved him back from a shooting investigation in town, referencing this new law while he continued to film. In this suit, he argues that Indiana's buffer law violates the First Amendment to the United States Constitution because

it is facially overbroad. After intervening, the State of Indiana defends the new law's constitutionality. The parties agree to consolidate this matter for a trial on the merits and a permanent injunction.[1]

The buffer law is not unconstitutional by virtue of being facially overbroad. The law has many legitimate applications; and, on this record, any effect on speech is minimal and incidental only, particularly in this day and age of sophisticated technology in the hands of most any citizen and at a modest distance of 25 feet. Whether the wisest iteration of a law that promotes the safety of officers and citizens and that serves other legitimate interests, the statute is not constitutionally overbroad. For this reason, the court now denies a permanent injunction.

## FINDINGS OF FACT

For several years, Mr. Nicodemus has regularly recorded police activity in the South Bend, Indiana area. He posts these recordings on his YouTube channel—"Freedom 2 Film"—with the hope that his more than 23,000 subscribers will better understand what law enforcement officers do and to shine a light on inappropriate police behavior. He livestreams videos. He says it is sometimes necessary to get within 25 feet of police activity so that his recordings are discernable to viewers.

In the early morning hours of July 20, 2023, Mr. Nicodemus went to the intersection of North Brookfield Street and Lincoln Way West in South Bend after hearing a report of shots fired there.[2] Six South Bend squad cars were at the scene along with several officers. Mr. Nicodemus noticed an officer marking bullet casings on the southwest corner of the intersection, so he stood on the northeast corner of the intersection and began livestreaming.

---

[1] The court commends all counsel for the quality of their submissions and their advocacy.

[2] Into evidence the court received two videos showing the evening's events, including the video taken by Mr. Nicodemus [Ex. 2] as well as bodycam footage from Officer Nathan Stepp [Ex. 1]. In addition, the court reviewed affidavits from several individuals, a proposed Rule 702 report, and certain South Bend Police Department policies.

Shortly after a semitruck was permitted to traverse the intersection,[3] Officer Nathan Stepp walked over to Mr. Nicodemus and ordered him and others to move back, walking off 25 feet from the west side of Brookfield Street. Why exactly he chose this point remains unclear, though an SBPD squad car was situated there. Officer Stepp says he moved the group of individuals, including Mr. Nicodemus, back so that they would not interfere with a potentially dangerous situation. He didn't mind the recording.

From watching the videos (both Officer Stepp's bodycam and the video taken by Mr. Nicodemus), there might be some question whether the officers were actually acting under Indiana's buffer law or Indiana's emergency incident perimeter law that was amended in 2023 at the same time as the buffer law was enacted, likewise to 25 feet (reduced from 150 feet). But the State seems to concede that the officers were acting under the buffer law such as to confirm Mr. Nicodemus's standing today.

Indiana's buffer law criminalizes as a misdemeanor a "person who knowingly or intentionally approaches within twenty-five (25) feet of a law enforcement officer lawfully engaged in the execution of the law enforcement officer's duties after the law enforcement officer has ordered the person to stop approaching." Ind. Code § 35-44.1-2-14. Initially by Officer Stepp, Mr. Nicodemus was only moved back a few steps. From this position, Mr. Nicodemus continued to record the activities of law enforcement, continued to report to his online followers, continued to engage the officers in conversation and criticism, and continued to capture audio of officers even beyond 25 feet.

Shortly after, a loud disturbance occurred at a house on the north side of Lincoln Way West past the intersection and past a closed retail building. From his position, Mr. Nicodemus could not record the house or this disturbance as officers approached the home. Either Mr. Nicodemus or another videographer next to him noted on video that they could move outside the shooting scene to a nearby

---

[3] Officer Stepp said he directed several vehicles away from the intersection, but he was told by another officer that he could allow a semitruck to pull through. He says a passenger vehicle errantly went through despite the presence of police cars blocking the road.

alley to view the disturbance, but by choice they stayed put.

Mr. Nicodemus and another videographer levied criticism toward the officers by yelling and swearing and asserting their right to record. Officer Jeffrey Veal walked to Mr. Nicodemus and others in response to the shouting. Officer Veal told the group that he was the crime scene technician (a position he has held since 2019), that the area of the intersection was a crime scene, and that they needed to move back another 25 feet. He referenced the "new law" from July 1.

Of note, a car had driven down Brookfield Street—straight through this location staked out by Officer Veal. Mr. Nicodemus protested that he had already been moved back 25 feet by Officer Stepp, but Officer Veal stood by his order and told Mr. Nicodemus he would go to jail if he didn't comply. Someone shouted an obscenity to Officer Veal, and the group continued to yell and swear. Officer Veal retrieved a ten-foot tape to measure his newly prescribed distance from the intersection, though it was not demonstrably far from the point that Mr. Nicodemus originally had chosen for his video.

## CONCLUSIONS OF LAW

An injunction is a "very far-reaching power, never to be indulged [] except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021). The parties consolidated this matter for a trial on the merits. To prevail at this stage, Mr. Nicodemus must show that (1) absent injunctive relief, he will suffer irreparable harm, (2) there is no adequate remedy at law, and (3) he succeeds on the merits of his claim. *City of Chi. v. Barr*, 961 F.3d 882, 893 (7th Cir. 2020) ("preliminary injunctive relief requires only a showing of a likelihood of success on the merits, whereas permanent relief requires a determination on the merits"); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 n.12 (1987) (same); *Tully v. Okeson*, 977 F.3d 608, 612-13 (7th Cir. 2020). If he makes these threshold showings, the court "consider[s] the balance of harms between the parties and the effect of granting or denying [an] injunction on the public interest." *Tully*, 977 F.3d at 613 (quotation omitted). This case falters on the third prong—the lack of success on the merits—so the court addresses no other.

A.  *First Amendment.*

A state legislature "shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I; *see also* U.S. Const. amend XIV; *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"). "Audio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas []. . . . The act of *making* an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *see also Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011). Such recording enables speech. *See Alvarez*, 679 F.3d at 597.

This right includes recording police conduct. *Id.* A "peaceful recording of an arrest in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation." *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011). The First Amendment "protects the right to remain in the area to be able to criticize the observable police conduct. Otherwise, an officer could easily stop the protected criticism by simply asking the individual to leave, thereby forcing them to either depart (which would effectively silence them) or face arrest." *Jordan v. Adams Cnty. Sheriff's Off.*, 73 F.4th 1162, 1169-70 (10th Cir. 2023); *see also Brown v. Kemp*, 2023 U.S. App. LEXIS 30112, 68 (7th Cir. Nov. 13, 2023) (visual proximity essential to recording activity). These recordings valuably serve law enforcement and the public. They facilitate transparency, training, scrutiny of police misconduct, and exoneration of officers from unfair charges. *See Fields v. City of Phila.*, 862 F.3d 353, 355 (3rd Cir. 2017).

But it "goes without saying that the police may take all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations. [Though] an officer surely cannot issue a 'move on' order to a person *because* he is recording, the police may order bystanders to disperse for reasons related to public safety and order and

5

other legitimate law-enforcement needs." *Alvarez*, 679 F.3d at 607. The court scrutinizes criminal statutes, such as the one today, with particular care because "those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987).

B. *Substantial Overbreadth.*

Mr. Nicodemus mounts a facial overbreadth challenge only.[4] To prevail on this type of facial attack, he must demonstrate that the challenged law, though it may be validly applied to him and others, "nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties." *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 11 (1988) (quotations omitted). There must be "a realistic danger that the statute [] will significantly compromise recognized First Amendment protections of [third] parties." *Id.* Such a challenge is "justified only by the recognition that free expression may be inhibited almost as easily by the potential or threatened use of power as by the actual exercise of that power." *Id.*

The statute must be "substantially" overbroad for Mr. Nicodemus to succeed. *Id.* To be precise, a law may be invalidated as overbroad when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021); *see also City of Houston*, 482 U.S. at 458 (statute must reach a "substantial amount of constitutionally protected conduct"). That is the rule here because no one argues that this statute has no constitutional applications; otherwise put, the parties recognize the statute might be constitutionally applied at times. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008).

To illustrate this rule of law in action, in *United States v. Stevens*, 559 U.S. 460, 481-82 (2010), a federal statute criminalizing the commercial creation, sale, or possession of depictions of animal cruelty was overbroad because it would cover hunting videos and magazines—a substantial amount of protected

---

[4] The court offers no views on any other constitutional analysis because none other has been argued. Mr. Nicodemus confirmed at oral argument that he advances no other challenge, including a vagueness challenge.

speech—while targeting within its plainly legitimate sweep videos of animal cruelty ("crush" videos) and animal fighting. In contrast, in *Broadrick v. Oklahoma*, 413 U.S. 601, 617-18 (1973), a statute prohibiting classified state employees from soliciting or receiving any contribution for any political organization, candidate, or other political purpose, as well as membership in any political party's committee, was not overbroad merely because it might also cover wearing political buttons or using bumper stickers; these applications of the statute were not substantial compared to prohibiting "clearly partisan political activity" in the interest of ensuring unbiased state employees.

Slight overbreadth isn't enough. There is another way to address slight overbreadth. Rather than a facial attack, a challenger can argue that the statute is unconstitutional as applied to him. For example, in *New York v. Ferber*, 458 U.S. 747, 766 (1982), a New York statute prohibiting persons from knowingly promoting an underage child's sexual performance by distributing materials depicting such performance was not constitutionally overbroad though, as written, it would forbid too the distribution of other material with arguable literary, scientific, or educational value or material outside the harms the state sought to combat. This was deemed a "paradigmatic case of a state statute whose legitimate reach dwarfs its arguably impermissible applications," such that "whatever overbreadth may exist [could] be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Id.* at 773-74. No as-applied challenge was made here, so there must be substantial overbreadth to declare this law unconstitutional today.

The State has demonstrated the buffer law's plainly legitimate sweep. *See Alvarez*, 679 F.3d at 607. Viewing this statute as only preventing interference with police activities is myopic. It criminalizes encroachment. It criminalizes a person's knowing encroachment into a zone of integrity that facilitates the performance of an officer's duties, and only then the officer's lawful duties, and only after the officer has advised the person to cease approaching, and only then within 25 feet. These are standards built within the law, and it isn't a regulatory scheme for prior approval of the right to record that requires more

workable standards. *Cf. Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759 (1988); *Broadrick*, 413 U.S. at 613. The law isn't directed toward speech, but encroachment. The law affords law enforcement officers the uninterrupted and unimpeded ability to do their jobs, including as examples the need to investigate, secure evidence and statements, and conduct other official police business safely; and it protects the integrity of government processes as well as suspects, victims, witnesses, and other citizens interacting with law enforcement from harm.

Foremost, the law promotes officer and public safety by ensuring that someone at a close distance cannot harm or hinder those charged with and engaged in their lawful duties, particularly when 25 feet affords an officer mere seconds of reaction time to respond to someone approaching at a walk, much less with ill-intent at a short sprint. *See United States v. Bonin*, 932 F.3d 523, 535 (7th Cir. 2019) (public safety compelling); *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 568 (6th Cir. 2016) (officer safety a particularly important governmental interest). An officer can take reasonable steps to promote safety and to maintain control. *Alvarez*, 679 F.3d at 607 (officer "may order bystanders to disperse for reasons related to public safety" and for "other legitimate law-enforcement needs"); *see, e.g., Colten v. Kentucky*, 407 U.S. 104, 109 (1972) (rejecting First Amendment right to congregate on side of highway to "observe the issuance of a traffic ticket or to engage the issuing officer in conversation at that time").

This buffer law also protects arrestees, suspects, victims, informants, witnesses, and other citizens from harm and inappropriate disclosure of confidential investigative facts. *See Alvarez*, 679 F.3d at 607 (officer may secure crime scenes and protect the confidentiality of investigations). Nothing about this law forecloses a reporter or concerned citizen from audiovisually recording conversations that occur openly in public and at a volume audible to bystanders at 25 feet. But not all conversations in public places are entitled to be recorded. "[S]ome conservations in public places implicate privacy." *Alvarez*, 679 F.3d at 608; *see also Katz v. United States*, 389 U.S. 347, 351 (1967) ("But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."); *John K. Maciver Inst. for Pub. Pol'y,*

8

*Inc. v. Evers*, 994 F.3d 602, 612 (7th Cir. 2023) ("right to speak and publish does not carry with it the unrestrained right to gather information").

This law protects the confidentiality of official law enforcement inquiries—questioning suspects, aiding the injured, safeguarding a victim, extracting information from an informant, or taking reports from witnesses. In such encounters, any one of these persons might be averse to speaking freely if he or she knew it would be posted on social media or broadcast on the evening news. To put a finer point on this, the law dissipates the risk of exposure or marginalization of a victim who might be endangered or embarrassed from immediately adjacent recording, *see, e.g., Fla. Star v. B.J.F.*, 491 U.S. 524, 537 (1989); and it protects the privacy interests of third-parties who might be targeted (but not charged) or who might be witnesses or informants, *see, e.g., Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 978 F. Supp.2d 1, 9 (D.D.C. 2013). They have certain privacy rights even when police may not. They have First Amendment rights too that otherwise might be curtailed. This law mitigates impairing law enforcement's ability to acquire information effectively or endangering their safety by distracting them from their official duties with happenings in their immediate vicinity. In doing so, the buffer law preserves not only the confidentiality of investigations but promotes the efficient administration of law enforcement. *See Bonin*, 932 F.3d at 535 ("protecting the integrity of government processes is compelling").

The State advances other legitimate applications for this buffer law—effectuating arrests and the like. *See City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 435 (2002) (reducing crime); *United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013) (making arrests safely and without interference). No one can seriously doubt that a buffer law could have these plainly legitimate applications in its sweep, though in Indiana a separate law largely covers these applications already. *See* Ind. Code § 35-44.1-4-2.[5] Of interest, the Indiana General Assembly amended this separate perimeter law when it enacted the 25-foot buffer

---

[5] Under this perimeter law, an "emergency incident" includes "(1) a structure or vehicle that is on fire; (2) a motor vehicle accident; (3) an accident involving hazardous materials; (4) a crime scene; (5) a police investigation; and (6) a location where an individual is being arrested." Ind. Code § 35-44.1-4-1.5.

9

law at issue here. The perimeter law originally allowed a 150-foot perimeter from an emergency incident, but now limits this to the area defined by law enforcement or 25 feet from the emergency incident, whichever is greater. One might say then the State of Indiana promoted more recording—greater First Amendment access and expression—than less by amending this law while also enacting the buffer law.

Not all of what an officer lawfully does will involve a set perimeter. An officer might be engaged in her lawful duties by completing reports in her squad car, serving process, aiding an injured citizen, or enforcing traffic laws. *See, e.g., Colten*, 407 U.S. at 109 ("State has a legitimate interest in enforcing its traffic laws and its officers [are] entitled to enforce them free from possible interference or interruption from bystanders, even those claiming a third-party interest in the transaction"). But not all lawful duties are so location-confined. Not all discussions with witnesses, informants, or victims will occur in a set perimeter under Indiana Code § 35-44.1-4-2, or be deemed interfered with under Indiana Code § 35-44.1-4-10.

A law enforcement officer often encounters fluid and ever-evolving circumstances that defy a set perimeter but for which a buffer around the officer would foster safety and other substantial government interests with merely nominal effects on the public's ability to record. *See Graham v. Connor*, 490 U.S. 386, 397 (1989) (officers often face "tense, uncertain, and rapidly evolving" circumstances). Foot pursuits of a suspect, active shooter scenarios, natural disasters, assisting those with mental health challenges, and a host of circumstances might elude a set perimeter and instead be served by this buffer law by promoting safety—not just the officer's safety but the videographer's safety—with but incidental effects on the public's ability to record. *See Branzburg v. Hayes*, 408 U.S. 665, 684-85 (1972) (reporters "have no constitutional right of access to the scenes of crime or disaster when the general public is excluded").

Mr. Nicodemus has not articulated a substantial number of applications that would prove unconstitutional in light of the law's plainly legitimate sweep. *See Americans*, 141 S. Ct. at 2387; *City of Houston*, 482 U.S. at 458. In conducting this analysis, the law must be careful not to exceed the statute's facial requirements or to invite the court (or parties) to speculate about "hypothetical" or "imaginary"

cases. *Wash. State Grange*, 552 U.S. at 450. "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *See Bonin*, 932 F.3d at 536-37 (quoting *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)). There must a "realistic danger." *Id.* Outside of a conceived impact on citizen recording, Mr. Nicodemus offers no realistic unconstitutional applications of this law. The court offered for consideration alternative hypotheticals in oral argument, but the court is convinced that none of these hypotheticals presents a realistic danger to First Amendment liberties; and should one such rare situation materialize, an as-applied challenge would serve the arrow in the aggrieved party's arsenal to address it. *See Ferber*, 458 U.S. at 773-74.

Mr. Nicodemus focuses on recording police conduct. At most this statute poses an incidental—not a substantial—effect on a First Amendment right to record it. A 25-foot buffer proves all but minor compared to the plainly legitimate sweep of cases. "When the expressive element of an expressive activity triggers the application of a general law, First Amendment interests are in play. On the other hand, when 'speech' and 'nonspeech' elements are combined, and the 'nonspeech' element [] triggers the legal sanction, the incidental effect on speech rights will not normally raise First Amendment concerns." *Alvarez*, 679 F.3d at 602; *accord United States v. O'Brien*, 391 U.S. 367, 376-77 (1968). For instance, a state could punish someone for burning a flag in violation of a law against outdoor fires, whereas it could not do so in violation of a law against dishonoring the flag—the former law being directed to conduct with incidental effect on speech and the latter law being directed toward speech.[6] *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992); *Texas v. Johnson*, 491 U.S. 397, 406 (1989).

---

[6] This distinction illustrates why an Arizona law prohibiting video recording within eight feet of law enforcement might prove unconstitutional, directed toward speech as it is, but why this law, directed at conduct with incidental effect on speech, would survive. *See Ariz. Broads. Ass'n v. Brnovich*, 626 F. Supp.3d 1102, 1105-06 (D. Ariz. 2022) (applying strict scrutiny). Or illustrates why a Wisconsin law that prohibits intentional interference with hunters by barring a visual or physical proximity to them, or by approaching them (with no distance set by statute), would be problematic by removing any ability to record hunting activity. *See Brown*, 2023 U.S. App. LEXIS at 1-2, 68.

The "First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011) (providing examples). "Orders regulating conduct often have incidental effects on speech, but this does not require courts to treat them as if they were regulations *of* speech." *Morgan v. White*, 964 F.3d 649, 652 (7th Cir. 2020) (finding incidental burden on speech when COVID-19 social distancing order made it harder for a campaign to "round up signatures"). "The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word," so long as it does not "proscribe particular conduct *because* it has expressive elements." *Johnson*, 491 U.S. at 406; *see, e.g., Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) (upholding ban on camping on the national mall as applied to demonstrators sleeping there overnight).

The buffer law gives officers the uninterrupted ability to perform their lawful duties. Never once does it permit law enforcement to stop the public's ability to record. The public retains that right—albeit from a vantage point 25 feet removed from where officers are engaged in their lawful duties. The law might have the incidental effect of preventing a recording within the 25-foot radius, but not every recording. In this day and age of enhanced technology, with zoom lenses that allow individuals to capture activity at hundreds of feet, or parabolic microphones that allow audio recording at distances well in excess of 25 feet, and with the ever-increasing capabilities of cellphones, drones, and common devices ubiquitously found in the hands of most every citizen, it seems rather strained to argue that citizens will suffer a substantial burden on their ability to record meaningfully. A 25-foot buffer, all but a common width of a two-car garage, or the length of a typical garden hose, or just small steps beyond an NBA three-point line, isn't a substantial burden on the right to record. Watchers of all sorts can still point out a foul observing from distances at 25 feet, and even greater, and can still hear a host of remarks. The times in which two things are true—that a law enforcement officer has no legitimate interest in situating a citizen 25 feet away while the citizen's recording suffers at that distance—will be scarce, not common.

In addition, for any one officer who has created a buffer of 25 feet in the engagement of his or her lawful duties, nothing forecloses a concerned citizen from selecting innumerable positions outside the 25-foot radius from the officer to record. If one vantage point provides a less than desirable recording angle in public, the citizen can move to any number of locations. Mr. Nicodemus had that same right here so long as he avoided approaching the officers. There may be an incidental impact on the proximity of police recording, but recording isn't prohibited or regulated by content. Every square inch of public space that is this short distance from a lawfully-engaged officer is fair game as an alternative location for recording. Not even the recording on July 20 suffered. Mr. Nicodemus mentions his inability to get to a separate disturbance at a house down the street, but he could have traversed other sidewalks or streets to get to another access point; indeed, he or his companion videographer mentioned just such an avenue through a nearby alley. They just chose not to use it.

Mr. Nicodemus says the right to record police activity includes the right to be close enough to have a meaningful view of police activity, and this statute burdens far more speech than necessary through arbitrary enforcement. *See Jordan*, 73 F.4th at 1169. But neither he nor any other citizen-journalist has a right to put a mic at the officer's mouth, or that of a victim, suspect, informant, arrestee, or witness, or to put a camera in their faces. Mr. Nicodemus's video also belies the difficulty in capturing activity greater than 25 feet away. Throughout the video, he easily captures events much greater than 25 feet and even the audio of officers speaking at a greater distance. Perhaps Mr. Nicodemus didn't pick up quieter conversations between the officers, but no one has the right to broadcast an entire event.[7] *See Branzburg*, 408 U.S. at 684; *Wis. Interscholastic Ath. Ass'n v. Gannett Co.*, 658 F.3d 614, 625 (7th Cir. 2011).

---

[7] In reply, Mr. Nicodemus cites the declaration of another citizen-journalist (Robert Perez) who was required to stay behind an area blocked off by tape, beyond 25 feet of an accident involving a victim. He says it was difficult to record the investigation from there. Nothing shows that this occurred under the new buffer law as opposed to the emergency incident law that establishes the right to set up a perimeter with tape as defined by law enforcement, or 25 feet from that. *See* Ind. Code. §§ 35-44.1-4-2(1), (2). This other videographer has no standing here.

Though this event didn't burden Mr. Nicodemus's First Amendment rights, such that he didn't bring an as-applied challenge today, the videos display some seeming confusion about Indiana's buffer law and Indiana's perimeter law—by both law enforcement and the observing public. This might not be unusual given that this event occurred a mere 19 days after the buffer law went into effect and the perimeter law was amended. The perimeter law's radius originates from an emergency incident or as defined by an officer, whereas the buffer law's 25 feet tees from a lawfully-engaged officer, prohibiting only a person's knowing or intentional approach of that officer after being ordered not to approach. This incident counsels careful training, and informed officers should be able to apply both the perimeter and buffer laws consistently in a manner that will help dissipate the confusion or frustration sometimes displayed during the July 20 events. But any such commotion from this summer night doesn't render this law substantially overbroad.

"Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003). This law isn't directed toward speech. Exercising judicial restraint with a facial challenge frees the law from "premature interpretations" of a statute or an "unnecessary pronouncement" of a constitutional rule that extends beyond the precise facts of each situation, *United States v. Raines*, 362 U.S. 17, 22 (1960); *accord Sabri v. United States*, 541 U.S. 600, 609 (2004), thereby short-circuiting the democratic process and frustrating the People's will as expressed in laws adopted consistent with the Constitution by their duly-elected representatives, *see Wash. State Grange*, 552 U.S. at 451. Facial overbreadth is constitutionally "strong medicine," to be employed "with hesitation" and "as a last resort." *Bonin*, 932 F.3d at 536. This isn't the rare case that calls for a dose of it. No one seriously contends that, aside from the alleged impact on recording (speech), albeit modest, that instituting a buffer for law enforcement to perform their lawful duties exceeds the government's constitutional power. *See Clark*, 468 U.S. at 298-99. The court thus denies a permanent injunction—for

Mr. Nicodemus does not succeed on the merits of his facial overbreadth challenge.[8]

CONCLUSION

Accordingly, the court DENIES Mr. Nicodemus's motion for permanent injunction [7] and GRANTS Mr. Nicodemus's motion to submit supplemental authority [34] and the State's motion for leave to file a response to the supplemental authority [35]. The court DIRECTS the clerk to enter final judgment for the City of South Bend, as defendant, and the State of Indiana, as intervenor. This order terminates the case.

The public has a First Amendment right to record police activity—a critically important right. Law enforcement officers have a right to perform their lawful duties unimpeded. Indiana's buffer law has many constitutional applications within its plainly legitimate sweep. It never once permits an officer to tell a reporter or citizen-journalist to leave altogether or to cease recording police activity. The law is directed toward encroachment on an officer's lawful duties within 25 feet. It doesn't target speech. It penalizes approaching a lawfully-engaged officer (after an order), not recording one. And at 25 feet, in measure small steps from an officer's work, this law has only an incidental effect on the public's First Amendment right to capture audio and video and otherwise to scrutinize police conduct. The court denies a permanent injunction because Indiana's buffer law is not unconstitutional by virtue of being facially overbroad. A case might be different if an officer enforces this law unconstitutionally in a particular scenario, but the court is not deciding such a case today.

SO ORDERED.

January 12, 2024         *s/ Damon R. Leichty*
                         Judge, United States District Court

---

[8] Consistent with the wisdom of deciding constitutional questions on their narrowest ground, *see Miller v. Downey*, 915 F.3d 460, 464 (7th Cir. 2019), the court need not address the level of constitutional scrutiny and other arguments given Mr. Nicodemus's failure to show substantial overbreadth at the start. Because the court resolves the question on the merits today, the court also need not consider whether the City of South Bend is liable as a municipality for the actions of South Bend police officers taken pursuant to state law.